# INTERNATIONAL PAPER CO. *v.* OUELLETTE ET AL.

No. 85–1233.   Argued November 4, 1986—Decided January 21, 1987

POWELL, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, O'CONNOR, and SCALIA, JJ., joined. BRENNAN, J., filed an opinion concurring in part and dissenting in part, in which MARSHALL and BLACKMUN, JJ., joined, *post*, p. 500. STEVENS, J., filed an opinion concurring in part and dissenting in part, in which BLACKMUN, J., joined, *post*, p. 508.

*Roy L. Reardon* argued the cause for petitioner. With him on the briefs were *Albert X. Bader, Jr.*, and *Caroline T. Mitchell.*

*Peter F. Langrock* argued the cause for respondents. With him on the brief were *Emily J. Joselson, Jeffrey L. Amestoy*, Attorney General of Vermont, and *Merideth Wright*, Assistant Attorney General.

*Deputy Solicitor General Wallace* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Fried, Assistant Attorney General Habicht, Richard J. Lazarus*, and *Jacques B. Gelin.*

JUSTICE POWELL delivered the opinion of the Court.

This case involves the pre-emptive scope of the Clean Water Act, 86 Stat. 816, as amended, 33 U. S. C. § 1251 *et seq.* (CWA or Act).[1] The question presented is whether the Act pre-empts a common-law nuisance suit filed in a Vermont court under Vermont law, when the source of the alleged injury is located in New York.

I

Lake Champlain forms part of the border between the States of New York and Vermont. Petitioner International

---

*John M. Cannon, Susan W. Wanat,* and *Ann Plunkett Sheldon* filed a brief for the Mid-America Legal Foundation as *amicus curiae* urging reversal.

A brief for the State of Tennessee et al. urging affirmance was filed by *W. J. Michael Cody*, Attorney General, *John Knox Walkup*, Chief Deputy Attorney General, *Frank J. Scanlon*, Deputy Attorney General, *Michael D. Pearigen*, Assistant Attorney General, and by the Attorneys General for their respective States as follows: *John K. Van de Kamp* of California, *Joseph I. Lieberman* of Connecticut, *Jim Jones* of Idaho, *Neil F. Hartigan* of Illinois, *Thomas J. Miller* of Iowa, *William L. Webster* of Missouri, *Robert M. Spire* of Nebraska, *Michael C. Turpen* of Oklahoma, *Arlene Violet* of Rhode Island, *T. Travis Medlock* of South Carolina, *Mark V. Meierhenry* of South Dakota, and *Mary Sue Terry* of Virginia.

[1] The statute also is known as the Federal Water Pollution Control Act. See note following 33 U. S. C. § 1251.

Paper Company (IPC) operates a pulp and paper mill on the New York side of the lake. In the course of its business, IPC discharges a variety of effluents into the lake through a diffusion pipe. The pipe runs from the mill through the water toward Vermont, ending a short distance before the state boundary line that divides the lake.

Respondents are a group of property owners who reside or lease land on the Vermont shore. In 1978 the owners filed a class action suit against IPC, claiming, *inter alia,* that the discharge of effluents constituted a "continuing nuisance" under Vermont common law. Respondents alleged that the pollutants made the water "foul, unhealthy, smelly, and . . . unfit for recreational use," thereby diminishing the value of their property. App. 29. The owners asked for $20 million in compensatory damages, $100 million in punitive damages, and injunctive relief that would require IPC to restructure part of its water treatment system.[2] The action was filed in State Superior Court, and then later removed to Federal District Court for the District of Vermont.

IPC moved for summary judgment and judgment on the pleadings, claiming that the CWA pre-empted respondents' state-law suit. With the parties' consent, the District Judge deferred a ruling on the motion pending the decision by the Court of Appeals for the Seventh Circuit in a similar case involving Illinois and the city of Milwaukee. In that dispute, Illinois filed a nuisance action against the city under Illinois statutory and common law, seeking to abate the alleged pollution of Lake Michigan. *Illinois* v. *Milwaukee,* 731 F. 2d 403 (1984) *(Milwaukee III),* cert. denied, 469 U. S. 1196 (1985).[3] The Court of Appeals ultimately remanded the case

---

[2] The complaint also sought monetary and injunctive relief for air pollution allegedly caused by the IPC mill. App. 35–36. This claim is not before the Court.

[3] The decisions in *Illinois* v. *Milwaukee,* 406 U. S. 91 (1972) *(Milwaukee I),* and *Milwaukee* v. *Illinois,* 451 U. S. 304 (1981) *(Milwaukee II),* are discussed in Part II, *infra.*

for dismissal of Illinois' claim, finding that the CWA precluded the application of one State's law against a pollution source located in a different State. The decision was based in part on the court's conclusion that the application of different state laws to a single "point source"[4] would interfere with the carefully devised regulatory system established by the CWA. 731 F. 2d, at 414. The court also concluded that the only suits that were *not* pre-empted were those alleging violations of the laws of the polluting, or "source," State. *Id.*, at 413–414.

IPC argued that the holding in *Milwaukee III* was dispositive in this case. The Vermont District Court disagreed and denied the motion to dismiss. 602 F. Supp. 264 (1985). The court acknowledged that federal law normally governs interstate water pollution. It found, however, that two sections of the CWA explicitly preserve state-law rights of action. First, § 510 of the Act provides:

> "Except as expressly provided . . . , nothing in this chapter shall . . . be construed as impairing or in any manner affecting any right or jurisdiction of the States with respect to the waters (including boundary waters) of such States." 33 U. S. C. § 1370.

In addition, § 505(e) states:

> "Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any effluent standard or limitation or to seek any other relief . . . ." 33 U. S. C. § 1365(e).

The District Court held that these two provisions (together, "the saving clause") made it clear that federal law did not pre-empt entirely the rights of States to control pollution.

---

[4] A "point source" is defined by the CWA as "any discernible, confined and discrete conveyance . . . from which pollutants are or may be discharged." 33 U. S. C. § 1362(14); see 40 CFR § 122.2 (1986). It is not disputed that IPC is a point source within the meaning of the Act.

Therefore the question presented, said the court, was which *types* of state suits Congress intended to preserve. It considered three possibilities:[5] first, the saving clause could be construed to preserve state law only as it applied to waters not covered by the CWA. But since the Act applies to virtually all surface water in the country,[6] the District Court rejected this possibility. Second, the saving clause might preserve state nuisance law only as it applies to discharges occurring within the source State; under this view a claim could be filed against IPC under New York common law, but not under Vermont law. This was the position adopted by the Court of Appeals for the Seventh Circuit in *Milwaukee III*. The District Court nevertheless rejected this option, finding that "there is simply nothing in the Act which suggests that Congress intended to impose such limitations on the use of state law." 602 F. Supp., at 269.

The District Court therefore adopted the third interpretation of the saving clause, and held that a state action to redress interstate water pollution could be maintained under the law of the State in which the injury occurred. *Ibid.* The court was unpersuaded by the concern expressed in *Milwaukee III* that the application of out-of-state law to a point source would conflict with the CWA. It said there was no interference with the procedures established by Congress because a State's "imposition of compensatory damage awards and other equitable relief for injuries caused . . . merely *sup-*

[5] For a discussion of each of the three interpretations of the saving clause, see Note, *City of Milwaukee v. Illinois:* The Demise of the Federal Common Law of Water Pollution, 1982 Wis. L. Rev. 627, 664–671.

[6] While the Act purports to regulate only "navigable waters," this term has been construed expansively to cover waters that are not navigable in the traditional sense. See *United States* v. *Riverside Bayview Homes,* 474 U. S. 121 (1985); 33 U. S. C. § 1362(7) (defining navigable waters as "waters of the United States"); 118 Cong. Rec. 33756–33757 (1972), 1 Legislative History of Water Pollution Control Act Amendments of 1972 (Committee Print compiled for the Senate Committee on Public Works by the Library of Congress), Ser. No. 93–1, p. 250 (1973) (hereinafter Leg. Hist.).

*plement* the standards and limitations imposed by the Act."
602 F. Supp., at 271 (emphasis in original). The court also
found that the use of state law did not conflict with the ulti-
mate goal of the CWA, since in each case the objective was to
decrease the level of pollution. *Ibid.*

The District Court certified its decision for interlocutory
appeal, see 28 U. S. C. § 1292(b) (1982 ed., Supp. III), and
the Court of Appeals for the Second Circuit affirmed for the
reasons stated by the District Court. 776 F. 2d 55, 56 (1985)
*(per curiam).* We granted certiorari to resolve the circuit
conflict on this important issue of federal pre-emption. 475
U. S. 1081 (1986). We now affirm the denial of IPC's motion
to dismiss, but reverse the decision below to the extent it
permits the application of Vermont law to this litigation.
We hold that when a court considers a state-law claim con-
cerning interstate water pollution that is subject to the
CWA, the court must apply the law of the State in which the
point source is located.

## II

A brief review of the regulatory framework is necessary to
set the stage for this case. Until fairly recently, federal
common law governed the use and misuse of interstate
water. See, *e. g., Hinderlider* v. *La Plata River & Cherry
Creek Ditch Co.,* 304 U. S. 92, 110 (1938) (water apportion-
ment); *Missouri* v. *Illinois,* 200 U. S. 496 (1906) (water pollu-
tion).[7] This principle was called into question in the context
of water pollution in 1971, when the Court suggested in dicta
that an interstate dispute between a State and a private com-
pany should be resolved by reference to state nuisance law.
*Ohio* v. *Wyandotte Chemicals Corp.,* 401 U. S. 493, 499, n. 3
(1971) ("[A]n action such as this, if otherwise cognizable in

[7] Accord, *North Dakota* v. *Minnesota,* 263 U. S. 365 (1923); cf. *Georgia*
v. *Tennessee Copper Co.,* 206 U. S. 230 (1907) (air pollution); see also *Mil-
waukee I,* 406 U. S., at 104–107; Glicksman, Federal Preemption and Pri-
vate Legal Remedies for Pollution, 134 U. Pa. L. Rev. 121, 152–155 (1985);
Note, 1982 Wis. L. Rev., at 630–636.

federal district court, would have to be adjudicated under state law") (citing *Erie R. Co.* v. *Tompkins,* 304 U. S. 64 (1938)).

We had occasion to address this issue in the first of two Supreme Court cases involving the dispute between Illinois and Milwaukee. In *Milwaukee I,* the State moved for leave to file an original action in this Court, seeking to enjoin the city from discharging sewage into Lake Michigan. *Illinois* v. *Milwaukee,* 406 U. S. 91 (1972). The Court's opinion in that case affirmed the view that the regulation of interstate water pollution is a matter of federal, not state, law, thus overruling the contrary suggestion in *Wyandotte.*[8] 406 U. S., at 102, n. 3. The Court was concerned, however, that the existing version of the Act was not sufficiently comprehensive to resolve all interstate disputes that were likely to arise. *Milwaukee I* therefore held that these cases should be resolved by reference to federal common law; the implicit corollary of this ruling was that state common law was pre-empted. See *id.,* at 107, n. 9; *Milwaukee III,* 731 F. 2d, at 407. The Court noted, though, that future action by Congress to regulate water pollution might pre-empt federal common law as well. 406 U. S., at 107.

Congress thereafter adopted comprehensive amendments to the Act. We considered the impact of the new legislation when Illinois and Milwaukee returned to the Court several years later.[9] *Milwaukee* v. *Illinois,* 451 U. S. 304 (1981)

---

[8] Although the Court's opinion could be read as distinguishing rather than overruling that part of *Wyandotte,* a later decision made it clear that state common-law actions did not survive *Milwaukee I.* See *Milwaukee II,* 451 U. S., at 327, n. 19; see also Glicksman, *supra,* at 156, n. 176.

[9] In *Milwaukee I* the Court denied a motion to file an original action but ruled that Illinois could maintain an action in federal district court. The State then filed suit in Illinois District Court, alleging that the city was liable for creating a public nuisance under both federal and Illinois common law. The complaint also alleged a violation of the State Environmental Protection Act. See *Milwaukee II, supra,* at 310, and n. 4; *Milwaukee III,* 731 F. 2d, at 404.

*(Milwaukee II)*. There the Court noted that the amendments were a "'complete rewriting'" of the statute considered in *Milwaukee I,* and that they were "'the most comprehensive and far reaching'" provisions that Congress ever had passed in this area. 451 U. S., at 317–318 (citations to legislative history omitted). Consequently, the Court held that federal legislation now occupied the field, pre-empting all *federal* common law. The Court left open the question of whether injured parties still had a cause of action under *state* law. *Id.,* at 310, n. 4. The case was remanded for further consideration; the result on remand was the decision of the Court of Appeals for the Seventh Circuit in *Milwaukee III,* discussed *supra.*

One of the primary features of the 1972 amendments is the establishment of the National Pollutant Discharge Elimination System (NPDES), a federal permit program designed to regulate the discharge of polluting effluents. 33 U. S. C. § 1342; see generally *EPA* v. *California ex rel. State Water Resources Control Board,* 426 U. S. 200, 205–208 (1976) (describing NPDES system). Section 301(a) of the Act, 33 U. S. C. § 1311(a), generally prohibits the discharge of any effluent into a navigable body of water unless the point source has obtained an NPDES permit from the Environmental Protection Agency (EPA). The permits contain detailed effluent limitations, and a compliance schedule for the attainment of these limitations.

The amendments also recognize that the States should have a significant role in protecting their own natural resources. 33 U. S. C. § 1251(b). The Act provides that the Federal Government may delegate to a State the authority to administer the NPDES program with respect to point sources located within the State, if the EPA Administrator determines that the proposed state program complies with the requirements set forth at 33 U. S. C. § 1342(b). The Administrator retains authority, however, to block the issuance of any permit to which he objects. § 1342(d). Even if

the Federal Government administers the permit program, the source State may require discharge limitations more stringent than those required by the Federal Government. See 40 CFR § 122.1(f) (1986). Before the Federal Government may issue an NPDES permit, the Administrator must obtain certification from the source State that the proposed discharge complies with the State's technology-based standards and water-quality-based standards. 33 U. S. C. § 1341(a)(1). The CWA therefore establishes a regulatory "partnership" between the Federal Government and the source State.

While source States have a strong voice in regulating their own pollution, the CWA contemplates a much lesser role for States that share an interstate waterway with the source (the affected States). Even though it may be harmed by the discharges, an affected State only has an advisory role in regulating pollution that originates beyond its borders. Before a federal permit may be issued, each affected State is given notice and the opportunity to object to the proposed standards at a public hearing. 33 U. S. C. § 1341(a)(2); *Milwaukee III, supra,* at 412. An affected State has similar rights to be consulted before the source State issues its own permit; the source State must send notification, and must consider the objections and recommendations submitted by other States before taking action.[10] § 1342(b). Significantly, however, an affected State does not have the authority to block the issuance of the permit if it is dissatisfied with the proposed standards. An affected State's only recourse is to apply to the EPA Administrator, who then has the discre-

---

[10] For a more detailed description of the permit system, see R. Zener, Guide to Federal Environmental Law 61–88 (1981).

At one point IPC was operating under a federal NPDES permit. App. 29–30. A draft of the permit was submitted to Vermont as an affected State, and Vermont as well as other interested parties objected to the proposed discharge standards. *Id.,* at 65–66. Thereafter, New York obtained permitting authority under 33 U. S. C. § 1342(b) and it now administers the permit.

tion to disapprove the permit if he concludes that the discharges will have an undue impact on interstate waters. § 1342(d)(2). Also, an affected State may not establish a separate permit system to regulate an out-of-state source. See § 1342(b) (State may establish permit system for waters "within *its* jurisdiction") (emphasis added), *Lake Erie Alliance for Protection of Coastal Corridor* v. *U. S. Army Corps of Engineers*, 526 F. Supp. 1063, 1074–1075 (WD Pa. 1981), aff'd, 707 F. 2d 1392 (CA3), cert. denied, 464 U. S. 915 (1983); *State* v. *Champion International Corp.*, 709 S. W. 2d 569 (Tenn. 1986), cert. pending, No. 86–57. Thus the Act makes it clear that affected States occupy a subordinate position to source States in the federal regulatory program.

## III

With this regulatory framework in mind, we turn to the question presented: whether the Act pre-empts Vermont common law to the extent that law may impose liability on a New York point source. We begin the analysis by noting that it is not necessary for a federal statute to provide explicitly that particular state laws are pre-empted. *Hillsborough County* v. *Automated Medical Laboratories, Inc.*, 471 U. S. 707, 713 (1985). Although courts should not lightly infer pre-emption,[11] it may be presumed when the federal legislation is "sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation." *Ibid.* (quoting *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218, 230 (1947)). In addition to express or implied pre-emption, a state law also is invalid to the extent that it "actually conflicts with a . . . federal statute." *Ray* v. *Atlantic Richfield Co.*, 435 U. S. 151, 158 (1978). Such a

---

[11] See *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218, 230 (1947) ("[W]e start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress"); *Milwaukee II*, 451 U. S., at 312; see also *Silkwood* v. *Kerr-McGee Corp.*, 464 U. S. 238, 255 (1984).

conflict will be found when the state law "'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Hillsborough County* v. *Automated Medical Laboratories, Inc.*, *supra*, at 713 (quoting *Hines* v. *Davidowitz*, 312 U. S. 52, 67 (1941)).

## A

As we noted in *Milwaukee II*, Congress intended the 1972 Act amendments to "establish an all-encompassing program of water pollution regulation." 451 U. S., at 318. We observed that congressional "views on the comprehensive nature of the legislation were practically universal." *Id.*, at 318, n. 12 (citing legislative history). An examination of the amendments amply supports these views. The Act applies to all point sources and virtually all bodies of water, and it sets forth the procedures for obtaining a permit in great detail. The CWA also provides its own remedies, including civil and criminal fines for permit violations, and "citizen suits" that allow individuals (including those from affected States) to sue for injunctions to enforce the statute.[12] In light of this pervasive regulation and the fact that the control of interstate pollution is primarily a matter of federal law, *Milwaukee I*, 406 U. S., at 107, it is clear that the only state suits that remain available are those specifically preserved by the Act.

Although Congress intended to dominate the field of pollution regulation, the saving clause negates the inference that Congress "left no room" for state causes of action. Respondents read the language of the saving clause broadly to preserve both a State's right to regulate its waters, 33 U. S. C. § 1370, and an injured party's right to seek relief under "any statute *or common law,*" § 1365(e) (emphasis added). They claim that this language and selected portions of the legisla-

---

[12] See 33 U. S. C. §§ 1319(a), 1365(a), (h); see generally *Middlesex County Sewerage Authority* v. *National Sea Clammers Assn.*, 453 U. S. 1, 13–14 (1981) (discussing "elaborate" remedial provisions).

tive history compel the inference that Congress intended to preserve the right to bring suit under the law of any affected State.[13] We cannot accept this reading of the Act.

To begin with, the plain language of the provisions on which respondents rely by no means compels the result they seek. Section 505(e) merely says that "[n]othing *in this section*," *i. e.*, the citizen-suit provisions, shall affect an injured party's right to seek relief under state law; it does not purport to preclude pre-emption of state law by other provisions of the Act. Section 510, moreover, preserves the authority of a State "with respect to the waters (including boundary waters) of such Stat[e]." This language arguably limits the effect of the clause to discharges flowing *directly* into a State's own waters, *i. e.*, discharges from within the State. The savings clause, then, does not preclude pre-emption of the law of an affected State.

Given that the Act itself does not speak directly to the issue, the Court must be guided by the goals and policies of the Act in determining whether it in fact pre-empts an action based on the law of an affected State. Cf. *City of Rome* v. *United States*, 446 U. S. 156, 199 (1980) (POWELL, J., dissenting) ("We resort to legislative materials only when the congressional mandate is unclear on its face"). After examining the CWA as a whole, its purposes and its history, we are convinced that if affected States were allowed to impose separate discharge standards on a single point source, the inevitable result would be a serious interference with the achievement of the "full purposes and objectives of Con-

---

[13] A Senate Report accompanying the amendments states: "[I]f damages could be shown, other remedies [in addition to a citizen suit] would remain available. Compliance with requirements under this Act would not be a defense to a common law action for pollution damages." S. Rep. No. 92–414, p. 81 (1971), 2 Leg. Hist. 1499. Respondents also note that after reviewing the legislative history, the District Court found no evidence that Congress intended to alter the traditional tort law principle that a party may bring suit in the State where the injury occurred. See *Young* v. *Masci*, 289 U. S. 253, 258–259 (1933).

gress." See *Hillsborough County* v. *Automated Medical Laboratories, Inc., supra,* at 713. Because we do not believe Congress intended to undermine this carefully drawn statute through a general saving clause,[14] we conclude that the CWA precludes a court from applying the law of an affected State against an out-of-state source.

## B

In determining whether Vermont nuisance law "stands as an obstacle" to the full implementation of the CWA, it is not enough to say that the ultimate goal of both federal and state law is to eliminate water pollution. A state law also is pre-empted if it interferes with the methods by which the federal statute was designed to reach this goal. See *Michigan Canners & Freezers Assn.* v. *Agricultural Marketing & Bargaining Bd.,* 467 U. S. 461, 477 (1984). In this case the application of Vermont law against IPC would allow respondents to circumvent the NPDES permit system, thereby upsetting the balance of public and private interests so carefully addressed by the Act.

By establishing a permit system for effluent discharges, Congress implicitly has recognized that the goal of the CWA—elimination of water pollution—cannot be achieved immediately, and that it cannot be realized without incurring costs. The EPA Administrator issues permits according to established effluent standards and water quality standards, that in turn are based upon available technology, 33 U. S. C. § 1314, and competing public and industrial uses, § 1312(a). The Administrator must consider the impact of the discharges on the waterway, the types of effluents, and the schedule for compliance, each of which may vary widely

---

[14] We noted in *Milwaukee II:*

"The fact that the language of [the saving clause] is repeated *in haec verba* in the citizen-suit provisions of a vast array of environmental legislation . . . indicates that it does not reflect any considered judgment about what other remedies were previously available or continue to be available under any particular statute." 451 U. S., at 329, n. 22.

among sources.   If a State elects to impose its own stand-
ards, it also must consider the technological feasibility of
more stringent controls.   Given the nature of these complex
decisions, it is not surprising that the Act limits the right to
administer the permit system to the EPA and the source
States.   See § 1342(b).

An interpretation of the saving clause that preserved
actions brought under an affected State's law would disrupt
this balance of interests.   If a New York source were liable
for violations of Vermont law, that law could effectively
override both the permit requirements and the policy choices
made by the source State.   The affected State's nuisance
laws would subject the point source to the threat of legal
and equitable penalties if the permit standards were less
stringent than those imposed by the affected State.   Such
penalties would compel the source to adopt different control
standards and a different compliance schedule from those
approved by the EPA, even though the affected State had
not engaged in the same weighing of the costs and benefits.
This case illustrates the problems with such a rule.   If the
Vermont court ruled that respondents were entitled to the
full amount of damages and injunctive relief sought in the
complaint, at a minimum IPC would have to change its meth-
ods of doing business and controlling pollution to avoid the
threat of ongoing liability.   In suits such as this, an affected-
state court also could require the source to cease operations
by ordering immediate abatement.   Critically, these liabil-
ities would attach even though the source had complied fully
with its state and federal permit obligations.   The inevitable
result of such suits would be that Vermont and other States
could do indirectly what they could not do directly—regulate
the conduct of out-of-state sources.[15]

_____

[15] The interpretation of the Act adopted by the courts below also would
have the result of allowing affected States effectively to set discharge
standards without consulting with the source State, even though source

Application of an affected State's law to an out-of-state source also would undermine the important goals of efficiency and predictability in the permit system. The history of the 1972 amendments shows that Congress intended to establish "clear and identifiable" discharge standards. See S. Rep. No. 92–414, p. 81 (1971), 2 Leg. Hist. 1499.[16] As noted above, under the reading of the saving clause proposed by respondents, a source would be subject to a variety of common-law rules established by the different States along the interstate waterways. These nuisance standards often are "vague" and "indeterminate."[17] The application of numerous States' laws would only exacerbate the vagueness and resulting uncertainty. The Court of Appeals in *Milwaukee III* identified the problem with such an irrational system of regulation:

> "For a number of different states to have independent and plenary regulatory authority over a single discharge would lead to chaotic confrontation between sovereign states. Dischargers would be forced to meet not only the statutory limitations of all states potentially affected by their discharges but also the common law standards

States are required by the Act to give affected States an opportunity to be heard and a chance to comment before issuing a permit.

[16] "The citizen suit provision [§ 505] is consistent with principles underlying the . . . Act, [which are] the development of clear and identifiable requirements. Such requirements should provide manageable and precise benchmarks for performance." S. Rep. No. 92–414, p. 81 (1971), 2 Leg. Hist. 1499.

[17] See *Milwaukee II*, 451 U. S., at 317; see also W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts 616 (5th ed. 1984) ("There is perhaps no more impenetrable jungle in the entire law than that which surrounds the word 'nuisance'"). The possibility that a source will have to meet a number of different standards is relatively small in this case, since Vermont is the only State that shares Lake Champlain with New York. But consider, for example, a plant that discharges effluents into the Mississippi River. A source located in Minnesota theoretically could be subject to the nuisance laws of any of the nine downstream States.

developed through case law of those states. It would be virtually impossible to predict the standard for a lawful discharge into an interstate body of water. Any permit issued under the Act would be rendered meaningless." 731 F. 2d, at 414.

It is unlikely—to say the least—that Congress intended to establish such a chaotic regulatory structure.

Nothing in the Act gives each affected State this power to regulate discharges. The CWA carefully defines the role of both the source and affected States, and specifically provides for a process whereby their interests will be considered and balanced by the source State and the EPA. This delineation of authority represents Congress' considered judgment as to the best method of serving the public interest and reconciling the often competing concerns of those affected by the pollution. It would be extraordinary for Congress, after devising an elaborate permit system that sets clear standards, to tolerate common-law suits that have the potential to undermine this regulatory structure.

## C

Our conclusion that Vermont nuisance law is inapplicable to a New York point source does not leave respondents without a remedy. The CWA precludes only those suits that may require standards of effluent control that are incompatible with those established by the procedures set forth in the Act. The saving clause specifically preserves other state actions, and therefore nothing in the Act bars aggrieved individuals from bringing a nuisance claim pursuant to the law of the *source* State. By its terms the CWA allows States such as New York to impose higher standards on their own point sources, and in *Milwaukee II* we recognized that this authority may include the right to impose higher common-law as well as higher statutory restrictions. 451 U. S., at 328 (suggesting that "States may adopt more stringent limitations . . . through state nuisance law, and apply them to in-state dischargers"); see also *Committee for Jones Falls Sewage*

*System* v. *Train,* 539 F. 2d 1006, 1009, and n. 9 (CA4 1976) (CWA preserves common-law suits filed in source State).[18]

An action brought against IPC under New York nuisance law would not frustrate the goals of the CWA as would a suit governed by Vermont law.[19]   First, application of the source

[18] Nothing in our decision, of course, affects respondents' right to pursue remedies that may be provided by the Act.   If, as was also alleged in respondents' complaint, IPC is violating the terms of its permit, respondents may bring a citizen suit to compel compliance.   33 U. S. C. § 1365.   Respondents also had the opportunity to protect their interests before the fact by commenting and objecting to the proposed standard.   See *Milwaukee II, supra,* at 326 (Act provides "ample" opportunity for affected States to protect their rights).

[19] The District Court concluded that the interference with the Act is insignificant, in part because respondents are seeking to be compensated for a specific harm rather than trying to "regulate" IPC.   602 F. Supp. 264, 271–272 (Vt. 1985).   The Solicitor General, on behalf of the United States as *amicus curiae,* adopts only a portion of this view.   He acknowledges that suits seeking *punitive* or *injunctive* relief under affected-state law should be pre-empted because of the interference they cause with the CWA.   The Government asserts that *compensatory* damages actions, however, may be brought under the law of the State where the injury occurred.   The Solicitor General reasons that compensatory damages only require the source to pay for the external costs created by the pollution, and thus do not "regulate" in a way inconsistent with the Act.   The Government cites *Silkwood* v. *Kerr-McGee Corp.,* 464 U. S. 238 (1984), for the proposition that in certain circumstances a court may find pre-emption of some remedies and not others.

We decline the Government's invitation to draw a line between the types of relief sought.   There is no suggestion of such a distinction in either the Act or the legislative history.   As the Court noted in *Silkwood,* unless there is evidence that Congress meant to "split" a particular remedy for pre-emption purposes, it is assumed that the full cause of action under state law is available (or as in this case, pre-empted).   *Id.,* at 255.   We also think it would be unwise to treat compensatory damages differently under the facts of this case.   If the Vermont court determined that respondents were entitled only to the requested compensatory relief, IPC might be compelled to adopt different or additional means of pollution control from those required by the Act, regardless of whether the purpose of the relief was compensatory or regulatory.   See *Perez* v. *Campbell,* 402 U. S. 637, 651–652 (1971) (effect rather than purpose of a state statute gov-

State's law does not disturb the balance among federal, source-state, and affected-state interests. Because the Act specifically allows source States to impose stricter standards, the imposition of source-state law does not disrupt the regulatory partnership established by the permit system. Second, the restriction of suits to those brought under source-state nuisance law prevents a source from being subject to an indeterminate number of potential regulations. Although New York nuisance law may impose separate standards and thus create some tension with the permit system, a source only is required to look to a single additional authority, whose rules should be relatively predictable. Moreover, States can be expected to take into account their own nuisance laws in setting permit requirements.[20]

IPC asks the Court to go one step further and hold that all state-law suits also must be brought in source-state *courts*. As petitioner cites little authority or justification for this position, we find no basis for holding that Vermont is an improper forum. Simply because a cause of action is preempted does not mean that judicial jurisdiction over the claim

erns pre-emption analysis). As discussed, this result would be irreconcilable with the CWA's exclusive grant of authority to the Federal Government and the source State. Cf. *Chicago & North Western Transportation Co.* v. *Kalo Brick & Tile Co.*, 450 U. S. 311, 324–325 (1981).

[20] Although we conclude that New York law generally controls this suit, we note that the pre-emptive scope of the CWA necessarily includes *all* laws that are inconsistent with the "full purposes and objectives of Congress." See *Hillsborough County* v. *Automated Medical Laboratories, Inc.*, 471 U. S. 707, 713 (1985). We therefore do not agree with the dissent that Vermont nuisance law still may apply if the New York *choice-of-law* doctrine dictates such a result. *Post*, at 507–508. As we have discussed, *supra*, the application of affected-state law would frustrate the carefully prescribed CWA regulatory system. This interference would occur, of course, whether affected-state law applies as an original matter, or whether it applies pursuant to the source State's choice-of-law principles. Therefore if, and to the extent, the law of a source State requires the application of affected-state substantive law on this particular issue, it would be pre-empted as well.

is affected as well; the Act pre-empts laws, not courts. In the absence of statutory authority to the contrary,[21] the rule is settled that a district court sitting in diversity is competent to apply the law of a foreign State.

## IV

The District Court correctly denied IPC's motion for summary judgment and judgment on the pleadings. Nothing in the Act prevents a court sitting in an affected State from hearing a common-law nuisance suit, provided that jurisdiction otherwise is proper. Both the District Court and the Court of Appeals erred, however, in concluding that Vermont law governs this litigation. The application of affected-state laws would be incompatible with the Act's delegation of authority and its comprehensive regulation of water pollution. The Act pre-empts state law to the extent that the state law is applied to an out-of-state point source.

The decision of the Court of Appeals is affirmed in part and reversed in part. The case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL and JUSTICE BLACKMUN join, concurring in part and dissenting in part.

I concur wholeheartedly in the Court's judgment that the Clean Water Act (Act), 33 U. S. C. § 1251 *et seq.*, does not pre-empt a private nuisance suit filed in a Vermont court when the source of the alleged injury is located in New York. I disagree only with the Court's view that a Vermont court must apply New York nuisance law.

## I

The question presented is whether the District Court properly denied International Paper Company's motion to dis-

---

[21] Cf. 33 U. S. C. § 1365(c)(1) (citizen suit to enforce permit must be brought in judicial district where source is located).

miss. The Court concludes that a federal district court, sitting in the State where the injury occurred, may hear a common-law nuisance suit to redress interstate water pollution *and* that the district court must apply the law of the State in which the point source is located. The Court improperly reaches out to decide the latter issue. As far as the parties and the Court know, "Vermont law and New York law are identical on the question of private nuisance." Tr. of Oral Arg. 24. Moreover, Vermont is the only State to share Lake Champlain with New York. Thus, the nuisance laws of New York and Vermont are the sole candidates for application in the present case, and they do not conflict. The respondents do not base their claims on any particular state law—"[t]he Complaint in this matter does not specify the jurisdiction of the common law it invokes or make a choice of law." Plaintiffs' Supplemental Memorandum of Law in Opposition to Defendant's Motion to Dismiss in No. 78–163, p. 4. Given these facts, I find it necessary only to affirm the denial of International Paper Company's motion to dismiss.

## II

Even were I to reach the issue of the state law applicable in this case, I would not interpret the Act to require a court sitting in the State where the injury has occurred (affected State) to apply the nuisance law of the State from which the pollution emanates (source State). Nothing in the Act preempts the usual two-step analysis undertaken by federal district courts to determine which state tort law should be applied in interstate tort suits. First, the district court must apply the conflict-of-law rules of the State in which the court sits. See *Day & Zimmerman, Inc.* v. *Challoner*, 423 U. S. 3, 4 (1975); *Klaxon Co.* v. *Stentor Electric Mfg. Co.*, 313 U. S. 487, 496 (1941) (holding that *Erie* doctrine applies to conflict-of-law rules). Thus, the Vermont District Court should apply the conflict-of-law rules of Vermont, the affected State. Second, these conflict-of-law principles must

be interpreted by the district court to determine whether the tort law of the source State or the affected State should be applied. Today the Court finds that the application of Vermont's nuisance law is pre-empted even if Vermont's conflict-of-law rules determine that Vermont's tort law should be applied.

The Act provides no support for deviation from well-settled conflict-of-law principles. Under conflict-of-law rules, the affected State's nuisance law may be applied when the purpose of the tort law is to ensure compensation of tort victims.[1] "[I]t is beyond dispute" that affected States have "a significant interest in redressing injuries that actually occur within the State." *Keeton* v. *Hustler Magazine, Inc.*, 465 U. S. 770, 776 (1984); see also *Allstate Ins. Co.* v. *Hague*, 449 U. S. 302, 307 (1981); *Huron Portland Cement Co.* v. *Detroit*, 362 U. S. 440, 442 (1960). This traditional interest of the affected State, involving the health and safety of its citizens, is protected by providing for application of the affected State's own tort laws in suits against the source State's polluters. See *Askew* v. *American Waterways Operators, Inc.*, 411 U. S. 325, 343 (1973); *Watson* v. *Employers Liability As-*

---

[1] States have adopted two different conflict-of-law approaches to determine which state tort law should be applied. The traditional rule of *lex loci delicti* requires the application of the tort law of the jurisdiction where the injury occurred. See 19 N. Y. Jur. 2d, Conflict of Laws § 39, p. 623 (1982); E. Scoles & P. Hay, Conflict of Law § 17.7, pp. 560–561 (1982). The rationale for the traditional rule is that the affected State possesses a strong interest in redressing injuries to its citizens. The modern rule, followed by the majority of States, employs an interest-analysis approach. See *Allstate Ins. Co.* v. *Hague*, 449 U. S. 302, 309 (1981). Under this analysis, if the primary purpose of the tort rule is to control the tortfeasor's conduct—such as the setting of pollution discharge standards—then the source State's tort law may be applied. Alternatively, if the main purpose of the tort rule is compensating victims of the tort, a court may apply the affected State's tort law. Other relevant considerations include the locations of the parties and where the relationship, if any, between the parties is centered. See Restatement (Second) of Conflict of Laws § 145, and Comment *c*, pp. 414–416 (1971).

*surance Corp.*, 348 U. S. 66, 72–73 (1954); *Young* v. *Masci*, 289 U. S. 253, 258–259 (1933). The State's interest in applying its own tort laws cannot be superseded by a federal act unless that was the clear and manifest purpose of Congress. See *Silkwood* v. *Kerr-McGee Corp.*, 464 U. S. 238, 248, 255 (1984); *Milwaukee* v. *Illinois*, 451 U. S. 304, 316 (1981) *(Milwaukee II)*.

Here Congress preserved the rights of source States and affected States alike to enforce state common-law claims. Section 510 provides: "Except as *expressly* provided . . . , nothing in this chapter shall . . . be construed as impairing or *in any manner affecting any right* or jurisdiction *of the States with respect to the waters (including boundary waters) of such States.*" 33 U. S. C. § 1370 (emphasis added). In preserving the right to seek traditional common-law relief, the Act draws no distinction between interstate and intrastate disputes; § 505(e) states: "Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any effluent standard or limitation or to seek any other relief." § 1365(e).[2] This provision contains no "express" restriction on the normal operation of state law, reflecting the Act's policy "to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution . . . ." § 1251(b).

By contrast, where Congress wanted to affect state common-law rights, it expressly stated this intent in the Act. Congress chose to pre-empt state law "only where the situation warranted it based upon the urgent need for uniformity

---

[2] The Court dismisses the importance of § 505(e) because that section "merely says that '[n]othing *in this section*,' *i. e.*, the citizen-suit provisions, shall affect an injured party's right to seek relief under state law; it does not purport to preclude pre-emption of state law by other provisions of the Act." *Ante*, at 493. But Congress used this language because this is the only section of the Act that expressly implicates private suits. Congress was reemphasizing that a State's authority over private suits, involving state common law, was not affected by the Act.

such as in section 312(f) relating to marine sanitation devices." H. R. Rep. No. 92–911, p. 136 (1972), 1 Legislative History of the Water Pollution Control Act of 1972 (Committee Print compiled for the Senate Committee on Public Works by the Library of Congress), Ser. No. 93–1, p. 823 (1973) (hereinafter Leg. Hist.).

I find that the Act's plain language clearly indicates that Congress wanted to leave intact the traditional right of the affected State to apply its own tort law when its residents are injured by an out-of-state polluter.

### III

The Court argues that, although the Act does not explicitly state that the affected States' laws are pre-empted here, applying the law of an affected State against an out-of-state source stands as an obstacle to the full implementation of the Act. The Court contends application of an affected State's common law is contrary to subsidiary objectives of the Act: (1) establishing the right of source States to set effluent standards for in-state polluters, *ante*, at 489–490; and (2) establishing clear and identifiable discharge standards, *ante*, at 496. The Court concludes that the affected State's common law is pre-empted by implication because of these conflicts. Although the Court plausibly argues that it is offering a better administrative approach, I do not believe that Congress meant to alter state law in this manner.

As a threshold matter, the Court's opinion assumes that in enacting the Act, Congress valued administrative efficiency more highly than effective elimination of water pollution. Yet there is no evidence that Congress ever made such a choice. Instead, the Act reflects Congress' judgment that a rational permit system, operating in tandem with existing state common-law controls, would best achieve the Act's primary goal of controlling water pollution. I base this conclusion on four important considerations.

First, since Congress preserved state common-law rights "[e]xcept as *expressly* provided," *supra,* at 503, the Court's reliance upon pre-emption by *implication* cannot justify its conclusion. Cf. *Silkwood* v. *Kerr-McGee Corp., supra,* at 255 ("Congress assumed that traditional principles of state tort law would apply with full force unless they were expressly supplanted").

Second, the legislative history of the Act indicates that Congress saw no peril to the Act in permitting the application of traditional principles of state law. The Senate Committee Report noted that Congress meant "specifically [to] preserve any rights or remedies under any other law. Thus, if damages could be shown, other remedies would remain available. *Compliance with requirements under this Act would not be a defense to a common law action for pollution damages."* S. Rep. No. 92–414, p. 81 (1971), 2 Leg. Hist. 1499 (emphasis added). The majority's concern that tort liability might undercut permit requirements was thus not shared by Congress.

In addition, the Environmental Protection Agency's (EPA) interpretation is consistent with Congress' view that state tort remedies were supplemental and wholly preserved under the Act. The regulations promulgated by the EPA recognize that meeting the source State's minimum effluent limits does not convey "any exclusive privilege." 40 CFR § 122.5(b) (1986). The EPA did not interpret the Act to modify state or local law: "The issuance of a permit does not authorize any injury to persons or property or invasion of other private rights, or any infringement of State or local law or regulations." § 122.5(c).

Third, we have refused to pre-empt a State's law, even when it is contrary to subsidiary objectives concerning administration, if the State's law furthers the federal statute's primary purpose and is consistent with the Act's saving of States' authority in an area traditionally regulated by States. See *Pacific Gas & Electric Co.* v. *Energy Resources Con-*

*servation and Development Comm'n,* 461 U. S. 190, 221–223 (1983). Subjecting polluters to state common-law liability simultaneously promotes the main federal goal of eliminating water pollution entirely, 33 U. S. C. § 1251(a)(1), and obeys the congressional command to leave state common law intact. Here Congress intended to stand by its federal regulatory scheme and the State's traditional liability laws "and to tolerate whatever tension there was between them." *Silkwood* v. *Kerr-McGee Corp.,* 464 U. S., at 256. "Given this statutory scheme, it is for Congress to rethink the division of regulatory authority in light of its possible exercise by States to undercut a federal objective. The courts should not assume the role which our system assigns to Congress." *Pacific Gas & Electric Co.* v. *Energy Resources Conservation and Development Comm'n, supra,* at 223.

Finally, the Court overstates any conflict between the affected State's nuisance law and the subsidiary objectives of the Act. The Court contends that applying the affected State's law would violate the source State's right to set effluent standards for in-state polluters. But if traditional conflict-of-law rules require the application of the affected State's nuisance law, there is no "conflict" with the source State's ability to set the *minimum* standards required under the Act. Congress considered state common-law rights to be supplementary to, and not in conflict with, the Act unless they embodied a "less stringent" standard for polluters than the federal effluent standards. See H. R. Rep. No. 92–911, pp. 169–170 (1972), 1 Leg. Hist. 856–857. The application of an affected State's common-law remedies to an out-of-state polluter does not conflict with the Act because it is possible for the polluter to redress the injuries suffered by the victims of the pollution and to obey the source State's effluent standards. By complying with the most stringent requirement — either under the Act or the affected State's law — the polluter necessarily complies with the more lenient standards. See *Silkwood* v. *Kerr-McGee Corp., supra,* at 257.

The Court also argues that application of an affected State's law to an out-of-state source would undermine the important goals of efficiency and predictability in the permit system. But Congress set out to establish "clear and identifiable" discharge standards, S. Rep. No. 92–414, p. 81 (1971), 2 Leg. Hist. 1499; it did not intend to reform the "impenetrable jungle" of state nuisance law, see *ante*, at 496, n. 17. As both legislative history and EPA regulations indicate, compliance with effluent standards is not a defense to state tort suits, see *ante*, at 496, and the affected State's nuisance law is no more "vague" and "indeterminate" than the source State's nuisance law. In fact, in the instant case, Vermont and New York nuisance law are apparently identical. See *supra*, at 501. While Congress intended to impose identifiable federal discharge standards upon polluters, we must have much more explicit evidence before assuming that in enacting such a provision Congress meant to revolutionize state conflict-of-law or tort law principles.

## IV

Even if the Court's conclusion that New York *law* should apply is correct, it does not logically follow that New York *nuisance law* must be applied in this case. In its haste to reach this result, the Court assumes that the imposition of the New York nuisance standard would be required by New York law in a suit where the alleged injury occurred in Vermont: "Because the Act specifically allows source States to impose stricter standards, the imposition of source-state *law* does not disrupt the regulatory partnership established by the permit system. . . . New York *nuisance law* may impose separate standards . . . ." *Ante*, at 499 (emphasis added).

Whether New York law requires the application of New York or Vermont nuisance law depends on an interpretation

of New York law *pertaining to conflict of laws*.[3] "A state has the same freedom to adopt its own rules of Conflict of Laws as it has to adopt any other rules of law. Conflict of Laws rules, when adopted, become as definitely a part of the law as any other branch of the state's law." Restatement (Second) of Conflict of Laws § 5, Comment *a*, p. 9 (1971). The Court reasons that a source State must have the primary role in regulating its own pollution discharges. Under this logic, nothing prevents a source State's legislature or courts from choosing to impose, under conflict-of-law principles, the affected State's nuisance law in a case such as this. A source State is free to adopt an affected State's standards as its own standards, *ante*, at 490 (noting that source State can accept advice of affected State).

The District Court correctly denied the petitioner's motion for summary judgment and judgment on the pleadings. For the reasons indicated above, I would affirm without reaching the question of the state law applicable in this case.

JUSTICE STEVENS, with whom JUSTICE BLACKMUN joins, concurring in part and dissenting in part.

In affirming the denial of International Paper Company's motion to dismiss, the Court concludes that nothing in the

---

[3] The respondents contend that under both New York and Vermont conflict-of-law principles, Vermont common law would apply to this action. Brief for Respondents 12. Petitioner does not contest this view. If this issue need be determined, it should, in my view, be remanded to the Court of Appeals. See, *e. g., Allstate Ins. Co.* v. *Hague*, 449 U. S., at 307; *Day & Zimmerman, Inc.* v. *Challoner*, 423 U. S. 3, 5 (1975) (BLACKMUN, J., concurring); *Klaxon Co.* v. *Stentor Electric Mfg. Co.*, 313 U. S. 487, 492 (1941). It is sufficient for the sake of argument to note that several cases suggest that New York conflict-of-law principles may require that Vermont law be applied in this instance. See, *e. g., Bing* v. *Halstead*, 495 F. Supp. 517, 520 (SDNY 1980) ("Where tortious conduct occurs in one jurisdiction and injury in another, as is the case here, the law of the place of injury applies"); *Cousins* v. *Instrument Flyers, Inc.*, 44 N. Y. 2d 698, 699, 376 N. E. 2d 914, 915 (1978) ("It is true that *lex loci delicti* remains the general rule in tort cases to be displaced only in extraordinary circumstances").

Clean Water Act, 33 U. S. C. § 1251 *et seq.*, deprives a Federal District Court of the diversity jurisdiction it would otherwise have to entertain a common-law nuisance suit brought against a point source located in another State and based on an injury allegedly suffered in the forum State. I agree with that holding and find it sufficient to decide this case.

The Court, however, goes further and ventures its opinion on whether the District Court must apply the substantive law of the State in which the source of water pollution is located. Perhaps the Court is responding to the District Court's observation, affirmed by the Court of Appeals, that the Clean Water Act "authorizes actions to redress injury caused by water pollution of interstate waters under the common law of the state in which the injury occurred." 602 F. Supp. 264, 274 (Vt. 1985). But since the District Court has not yet been asked to decide—or decided—which substantive law will govern this particular suit, there is no dispute between the parties on this issue and the Court has no business discussing it at this stage of the litigation. In its rush to express the opinion that the substantive law of the source State must govern, the Court broadly asserts that "[t]he Act preempts state law to the extent that the state law is applied to an out-of-state point source." *Ante,* at 500. But on this record, the Court does not even know whether Vermont state law, including its choice-of-law rules, would look to the New York law of nuisance to govern a nuisance suit based on an alleged source in New York.

The Court's opinion is thus partially advisory for three reasons. The question of the applicable state law it addresses has not yet arisen in this litigation; when it does arise, the District Court may well conclude that Vermont's choice-of-law rules require it to apply New York's substantive law; and, as JUSTICE BRENNAN points out, *ante,* at 501, there is no reason to believe that there is any difference between the relevant New York and Vermont law in any event. One cannot help but wonder what has happened to the once respected doctrine of judicial restraint. Just as this Court does not sit

to edit the opinions of lower courts, see *Phillips Petroleum Co.* v. *Shutts*, 472 U. S. 797, 823 (1985) (STEVENS, J., concurring in part and dissenting in part), it also does not sit to draft advisory opinions for the possible future guidance of other courts. I therefore respectfully dissent from that part of the Court's opinion holding that the Clean Water Act requires the District Court to apply the nuisance law of the source State.