ESTATE OF Albert A. WOLL, by David WOLL, Co–Trustee of the Third Restatement of Intervivos Revocable Trust for the Benefit of Albert A. Woll, Plaintiff–Appellee,

v.

UNITED STATES of America, Defendant–Appellant.

No. 94–1192.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 8, 1994.

Decided Dec. 30, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied Jan. 30, 1995.

---

See also, 809 F.Supp. 643.

Alan N. Shovers, Marjorie J. Scharpf (argued), Kahn, Dees, Donovan & Kahn, Evansville, IN, for plaintiff-appellee.

Judith A. Stewart, Office of the U.S. Atty., Indianapolis, IN, Gary R. Allen, Robert W. Metzler, Gilbert S. Rothenberg (argued), Karen A. Smith, Stephen T. Lyons, Dept. of Justice, Tax Div., Appellate Section, Washington, DC, for defendant-appellant.

Before COFFEY and ROVNER, Circuit Judges, and FOREMAN, District Judge.*

ILANA DIAMOND ROVNER, Circuit Judge.

After ruling against the government on the merits of a suit challenging the tax assessed against a decedent's estate, the district court concluded that the government's litigating position had not been substantially justified and that the estate was entitled to recover its attorneys' fees and costs. We hold that in determining an estate's eligibility to recover its fees and costs, a court must consider the net value of all assets in the estate, even those that were distributed in advance of suit. Here the record indicates that when distributed assets are included in the net worth determination, the estate is disqualified from recovering its litigation expenses. We therefore reverse the award of fees and costs.

## I. FACTS

Albert Woll died testate on August 8, 1987. He was survived by three children and his second wife, Sarah G. Woll. His estate included the assets of two trusts, one a revocable trust established by Albert during his lifetime (the "Albert A. Woll Trust," which we shall refer to as the "AWT"), and another that came into being upon the 1985 death of Albert's first wife, Pearl (the "Albert A. Woll Marital Trust," which we shall refer to as the "PWT"), pursuant to the terms of a revocable trust she had established during her lifetime (the "Pearl Trust"). The terms of the PWT had made the principal and interest of that trust available to Albert for the remainder of his life, but provided that on his death, the balance after taxes be distributed in equal shares to the three children of Pearl and Albert. The AWT directed that Sarah be given the use of the home that she and Albert had shared for the remainder of her life and provided that Albert's personal effects be distributed to his children immedi-

---

* The Honorable James L. Foreman, of the Southern District of Illinois, sitting by designation.

ately. The remainder of the assets in the AWT trust estate were to be placed in the "Sarah G. Woll Qualified Terminable Interest Property Trust" ("SWT") which would provide income to Sarah during her lifetime. Upon her death, the principal of the SWT would then be distributed to the children of Albert and Pearl in equal shares.

A dispute arose between Albert's estate and the IRS as to whether the taxes, debts, and administrative expenses chargeable to the estate should be paid by the PWT or the AWT. On the estate tax return filed with the IRS, the estate claimed a marital deduction for all property in the AWT that was to be distributed to the SWT. In calculating the amount of that deduction, the estate assumed that the PWT would pay any taxes and other expenses owed by Albert's estate. When it conducted an audit, however, the IRS concluded that the AWT should pay these items, an allocation that would have the effect of diminishing the amount of property remaining in the AWT for distribution to the SWT and, consequently, reducing substantially the size of the marital deduction that the estate could claim. By the IRS' reckoning, the estate owed an additional tax of $179,302.29 and interest of $73,758.95. The estate paid the assessment and, after its claim for a refund was rejected, filed this suit pursuant to 26 U.S.C. § 7422 and 28 U.S.C. § 1346(a)(1).

On cross-motions for summary judgment, the district court held for the estate. The court looked primarily to the provisions of the Pearl Trust to decide whether the PWT or AWT should be charged with the taxes and other expenses occasioned by Albert's death. The Pearl Trust dictated that upon the death of the survivor of Albert and Pearl, the assets remaining in the PWT would be distributed to their children. However, it also specified that PWT funds should be used to pay any taxes "which may be assessed as the result of the death of the primary beneficiary"—the primary beneficiary being Pearl. The district court construed these provisions to mean that any taxes occasioned by the distribution of the PWT assets to the children on Albert's death would be paid from the PWT itself (before the remainder was distributed to the children) rather than from any other asset in Albert's estate. Moreover, the court noted, once Pearl had died, these provisions became irrevocable; thus, the Trust's directive as to the payment of taxes could not be altered by anything that Albert might direct later. For that reason, the district court found it unnecessary to consider any of the provisions in the AWT and Albert's will relating to the payment of taxes. 809 F.Supp. 643, 645. Finally, although the Pearl Trust ostensibly authorized the payment of taxes only insofar as such taxes resulted from the death of the "primary beneficiary" of the Pearl Trust, the court found it unnecessary to decide whether "primary beneficiary" really meant Pearl alone (as the terms of the Pearl Trust suggested) or included Albert as well. Despite the fact that the taxes came due only upon Albert's death, "[t]hese taxes would not be due if Pearl were living, therefore they are due 'as a result of' [Pearl's] death." *Id.*

Having thus convinced the court to order a refund of the additional estate tax and interest, the estate then sought an award of attorneys' fees and costs, arguing that it had "substantially prevailed" and that the government's position in the litigation had not been "substantially justified." *See* 26 U.S.C. § 7430(c)(4). The government opposed the motion, arguing that the estate exceeded the $2 million net worth ceiling imposed on individuals eligible to recover litigation expenses and, in any event, that the government's position in the litigation had been "substantially justified."

The court granted the estate's motion. The court was satisfied that the three sources of estate assets totalled less than $2 million as of the date of suit: by that time, the PWT had been distributed and had a value of $0; the AWT had a net value of between $902,369.91 and $955,295.00; and Albert's probate estate had an unspecified but concededly negligible value, certainly less than the more than $1 million it would take to put the estate over the $2 million limit. The court rejected the government's contention that the net worth of the estate should be calculated using the value of all assets in the estate at the time of Albert's death,

including the PWT in particular, which had a value of approximately $1 million. Nov. 24, 1993 Mem. Op. and Order at 3–4. The court went on to conclude that the government's position in the suit had not been substantially justified: "Only by ignoring the unambiguous language of the PWT and through an absurd reading of the AWT and Albert's will was it even possible to understand the United States' argument." *Id.* at 5. Having thus concluded that the estate qualified as a "prevailing party," the court awarded the $17,-147.00 in fees and $619.89 in costs requested. *Id.* at 6. From this award the government appeals.

## II.

The government renews each of the two objections it asserted below to the estate's request for fees and costs, maintaining that the estate did not satisfy the net worth requirement and that the government's position had been substantially justified. Because we conclude that the net worth of the estate, when properly calculated, exceeded the $2 million ceiling and thus rendered the estate ineligible to recover its fees and costs, we confine our analysis to that question alone; whether the government's position was "substantially justified" is a matter we need not reach.

We begin with the relevant statutory provisions. Section 7430 of the Internal Revenue Code provides:

> In any … court proceeding which is brought by or against the United States in connection with the determination, collection, or refund of any tax, interest, or penalty under this title, the prevailing party may be awarded a judgment or a settlement for—
>
> .    .    .    .    .
>
> (2) reasonable litigation costs incurred in connection with such court proceeding.

26 U.S.C. § 7430(a). The statute later defines "prevailing party" as follows:

> (A) **In general.**—The term "prevailing party" means any party in any proceeding to which subsection (a) applies (other than the United States or any creditor of the taxpayer involved)—
>
> (i) which establishes that the position of the United States was not substantially justified,
>
> (ii) which—
>
> (I) has substantially prevailed with respect to the amount in controversy, or
>
> (II) has substantially prevailed with respect to the most significant issue or set of issues presented, and
>
> (iii) which … meets the requirements of section 2412(d)(2)(B) of … title 28 (as so in effect).

26 U.S.C. § 7430(c)(4). By specifying that a party must meet the requirements of 28 U.S.C. § 2412(d)(2)(B), the statute incorporates the net worth requirements of the Equal Access to Justice Act. The EAJA provides:

> "[P]arty" means (i) an individual whose net worth did not exceed $2,000,000 at the time the civil action was filed, or (ii) any owner of an unincorporated business, or any partnership, corporation, association, unit of local government, or organization, the net worth of which did not exceed $7,000,000 at the time the civil action was filed, and which had not more than 500 employees at the time the civil action was filed; except that an organization described in section 501(c)(3) of the Internal Revenue Code of 1986 (26 U.S.C. 501(c)(3)) exempt from taxation under section 501(a) of such Code, or a cooperative association as defined in section 15(a) of the Agricultural Marketing Act (12 U.S.C. 1141j(a)), may be a party regardless of the net worth of such organization or cooperative association[.]

28 U.S.C. § 2412(d)(2)(B). *See generally Wilfong v. United States,* 991 F.2d 359, 364 (7th Cir.1993).

Notably, the EAJA does not list estates among the parties eligible to recover litigation costs. However, seeing no reason to treat estates differently from individuals, the Tax Court, the Court of Claims, and at least two district courts have concluded that estates should be permitted to recover their costs despite the statutory omission. *Estate of Hubberd v. C.I.R.,* 99 T.C. 335, 338–39,

1992 WL 224512 (1992); *Papson v. United States,* 82–1 USTC ¶ 13,466, 1982 WL 11261, at *3 (Ct.Cl.1982) (per curiam); *Boatmen's First Nat. Bank of Kansas City v. United States,* 723 F.Supp. 163, 169 (W.D.Mo.1989); *Hoffman v. Heckler,* 656 F.Supp. 1136, 1137 (E.D.Pa.1987). *See also Estate of Curry v. United States,* 549 F.Supp. 47, 49 (S.D.Ind. 1982), *rev'd on other grounds,* 706 F.2d 1424 (7th Cir.1983).[1] Moreover, the Commissioner of Internal Revenue has proposed regulations pursuant to section 7430 that expressly include estates among the parties eligible to recover costs in administrative proceedings. Prop.Treas.Reg. § 301.7430–5(f)(1), 57 Fed. Reg. 61020, 61028 (Dec. 23, 1992). In view of these authorities, the government has conceded here that an estate can recover its litigation costs provided that it meets the other requirements of sections 7430 and 2412(d)(2)(B).

■ The parties also appear to agree that the pertinent net worth limitation is the $2 million limit applicable to individuals.[2] One court has instead found the $7 million limit applicable, deeming the estate "an 'organization,' of assets and liabilities, for purposes of the statute." *Boatmen's,* 723 F.Supp. at 169. Yet, most courts have either held or assumed that the estate should be treated on par with an individual, *see Papson,* 1982 WL 11261, at *3; *Estate of Curry,* 549 F.Supp. at 49; *Weiss v. C.I.R.,* 850 F.2d 111, 114 n. 3, 115 (2d Cir.1988); *see also* Prop.Treas.Reg. § 301.7430–5(f)(1), 57 Fed.Reg. 61020, 61028—logically so, in our view, given that an estate arises from the death of an individual and serves to dispose of that person's assets and liabilities.[3]

■ The focus of the parties' dispute is on how the net worth of the estate is to be determined—a question of law that we examine de novo. *See Curtis v. Shalala,* 12 F.3d 97, 99 (7th Cir.1993). The EAJA indicates that the net worth of the individual (and thus, for our purposes, the estate) is to be measured as of the date the complaint was filed—here, in November of 1991. In the estate's view, this means that only assets remaining undistributed as of that date may be included in the calculation of net worth. The district court agreed. *Accord Boatmen's,* 723 F.Supp. at 169. In light of the unique nature and purpose of estates, however, we find ourselves persuaded by the government's contention that assets distributed in advance of suit cannot be disregarded in calculating the net worth of the estate.

The net worth limitations of the EAJA reflect one of the underlying purposes of that statute as well as section 7430—to make it economically feasible for private parties to challenge the unreasonable actions of a government with superior resources. *See, e.g., State of Louisiana ex rel. Guste v. Lee,* 853 F.2d 1219, 1223 & n. 22 (5th Cir.1988); *Greater Detroit Resource Recovery Auth. v. Adamkus,* 677 F.Supp. 521, 526 (E.D.Mich. 1987). The EAJA's focus on net worth at the time a suit is filed is consistent with this notion. An individual, for example, might be worth many millions of dollars when her dispute with the government arises but suffer a reversal of fortunes that leaves her with only modest resources when the time comes to litigate. At that juncture, she is no less deterred from filing suit against the governmental behemoth than an individual who was never well off to begin with.

1. *Papson* and *Hoffman* construed the EAJA alone, as those cases were not tax-related and section 7430 was thus inapplicable. They are nonetheless relevant, given that section 7430 incorporates the EAJA's definition of the term "party." *Curry,* although it involved tax litigation, pre-dated section 7430 and likewise relied on the EAJA alone.

2. Below, the estate did suggest that the $7 million net worth limitation applicable to corporations and organizations should be applied to estates. *See* R. 31 at 3–4. The district court found it unnecessary to reach the issue, believing that the net worth of the estate did not in any event

exceed the lower of the two limits. Nov. 24, 1993 Mem. Op. and Order at 3 n. 3. The estate has not renewed its argument on appeal; its brief is instead confined to the contention that the net worth of the estate, properly calculated, did not exceed $2 million. *See* Estate's Br. at 14–17. It has thus conceded that the $2 million limit governs.

3. A revenue measure approved by Congress in 1992 contained a provision specifying that estates would be eligible to recover fees subject to the $2 million net worth limitation. *See Estate of Hubberd,* 99 T.C. at 341 n. 3. However, that bill was vetoed by President Bush.

An estate is a somewhat different creature in this regard, however. It is not merely possible that an estate's assets will dwindle over time, but certain. After all, an estate is merely the sum total of a deceased person's property, destined for distribution to others in accordance with either the decedent's will or the state's inheritance laws. *See* Ind.Code § 29–1–1–3; Uniform Probate Code (U.L.A.) § 1–201(14) (1983 & Supp.1994); *In re Estate of Francis,* 327 N.C. 101, 394 S.E.2d 150, 155 (1990). As such, the estate has no ends of its own; its business is simply to marshal the deceased's assets, satisfy any debts, and distribute the remainder as dictated by the decedent and by law. *See* Jesse Dukeminier & Stanley M. Johanson, *Wills, Trusts, and Estates,* 30, 37–50 (4th ed. 1990). Consequently, in contrast to the vagarious ups and downs of individual and corporate wealth, the net worth of an estate can be expected to follow a relatively uniform progression toward zero as the estate is disbursed. Accordingly, any estate with a net worth in excess of the EAJA's $2 million ceiling will, sooner or later, drop below that limit.

It therefore would be somewhat arbitrary to evaluate an estate's entitlement to litigation costs based simply on what assets remain to be distributed as of the date the suit is filed. The practical ability of a given estate to shoulder the burden of litigation is best judged by the net value of the entire estate, including assets which have already been distributed by the date of suit. Estate administrators, after all, do not disburse assets willy nilly with no regard for bills that will come due in the future.[4] Instead, a portion of the estate is routinely reserved to cover taxes, legal fees, administrative costs, and other expenses that necessarily will have to be paid before the estate can be closed; and distributions to the beneficiaries of the estate are adjusted accordingly. *See* Uniform Probate Code §§ 3–101, 3–805, 3–807, 3–902, 3–916; Ind.Code §§ 29–1–17–3, 29–1–17–4.[5] Indeed, with that in mind, Pearl and Albert both included provisions in their trusts authorizing their successor co-trustees to withhold from distribution enough money to pay the taxes and other expenses their estates might be required to bear. App. 22a–23a, 39a; *see also* App. 14a. For this reason, it would be anomalous to treat a $5 million estate with $500,000 in undistributed assets remaining on the date of suit as the equivalent of a $500,000 estate with all assets undistributed as of that same date; the former clearly has a significantly greater ability to bear the expense of litigating with the government, and presumably the money remaining in the estate at the time of suit has in fact been set aside for the very purpose of handling that and other costs.

Focusing merely on the value of assets undistributed on the date of suit would lead to other disparities as well. Consider two estates each with $3 million in net assets, and each pursuing identical tax disputes with the government: one is disbursed smoothly and on the date of suit retains only $100,000 in assets; the other is ensnared in an ugly will contest which leaves the entire corpus undistributed by the time litigation with the government commences. Relying on the remaining assets as the sole measure of the estate's eligibility for fees deprives the second estate of the opportunity to recover its litigation costs but bestows a windfall on the first estate despite the fact that both estates began with the same net worth.

Excluding distributed assets from the net worth calculation gives rise not only to these types of arbitrary distinctions between estates of comparable resources, but arguably gives estate administrators an incentive to

---

4. Nor do creditors turn a blind eye while estate assets are being distributed. We are confident, for example, that the estate's lawyers did not rest all of their hopes for compensation for their work in this case on the possibility of a fee award at the end of the litigation. More likely, they made some advance arrangements for their work on this case to be compensated from estate funds. *See* Uniform Probate Code § 3–720.

5. Indeed, should the estate's property be distributed too rapidly and the estate be left with taxes and other debts that exceed the assets on hand to satisfy them, the distributees may be called upon to make good on the outstanding obligations. Uniform Probate Code § 3–1004; 26 U.S.C. § 6324(a)(2). *See, e.g., Berliant v. C.I.R.,* 729 F.2d 496 (7th Cir.), *cert. denied sub nom. Kraft v. C.I.R.,* 469 U.S. 852, 105 S.Ct. 174, 83 L.Ed.2d 109 (1984); *United States v. Geniviva,* 16 F.3d 522 (3d Cir.1994).

manipulate the timing of distributions and litigation against the government in order to duck below the $2 million EAJA limit. Other litigants could theoretically do the same, of course, and yet it seems unlikely that a prosperous individual or corporation would shed assets simply to become eligible for an award of litigation expenses. But an estate is in the very business of disbursing assets, so it is quite plausible to think that it would suffer no detriment to orchestrate the timing of distributions in order to bring the remainder of the estate below the EAJA limit in advance of suit; and a clever personal representative might do just that.

Perhaps with these same considerations in mind, Congress included a provision in a 1992 revenue measure clarifying not only that estates with a net worth of less than $2 million would be eligible to recover fees, *see* n. 3, *supra,* but specifying that the net worth calculation should be made as of the date of the individual's death. *Estate of Hubberd, supra,* 99 T.C. at 341 n. 3. That bill was vetoed, however, leaving the statute in its present state. Given the EAJA's unqualified mandate to assess the net worth of individuals and corporations as of the date suit was filed, we do not believe ourselves free to read into the statute a different reference date for estates. Nonetheless, because the EAJA does not expressly identify estates as among the parties eligible to recover fees, we have some leeway in determining how, consistent with the spirit of section 7430 and the EAJA, the net worth of the estate on the date of suit is to be calculated. *See generally American Agric. Movement, Inc. v. Board of Trade of City of Chicago,* 977 F.2d 1147, 1155 (7th Cir.1992) (citing *International Paper Co. v. Ouellette,* 479 U.S. 481, 493, 107 S.Ct. 805, 812, 93 L.Ed.2d 883 (1987)). For the reasons we have already articulated, we conclude that the calculus must include all assets in the estate, including those already distributed. This holding follows naturally, we believe, from the notion that individuals and their estates should be treated as equals in terms of their eligibility to recover fees—the estate, after all, is no more and no less than the legacy of Albert Woll, whose own net worth became fixed upon his death, delimited by the sum total of *all* of his assets and liabilities. *See Papson v. United States, supra,* 1982 WL 11261, at *3.[6]

■ In opposing the estate's request for fees and costs before the district court, the government argued that when liabilities were deducted from the $2.9 million in total estate assets, the resulting net worth exceeded the $2 million ceiling. R. 29 at 10–11. In reply, although the estate disputed the government's contention that distributed assets should be included in the net worth calculation, it did not argue in the alternative that the government had in any event mistakenly calculated the net worth of the total estate, nor did it reserve the right to submit alternate calculations in the event the district court agreed that both distributed and undistributed assets must be included in the determination. *See* R. 31 at 5. Its brief on appeal likewise did not quarrel with the figures that the government used in calculating the net worth of the entire estate. *Compare* Government's Opening Br. at 44–45 n. 20 with Estate's Br. at 14–17. At oral argument, however, the estate's counsel seemed to suggest that even if all assets were included in the net worth determination, the estate still may not have exceeded the $2 million ceiling. Any such argument had long been waived, however. As the party seeking to recover its litigation costs, the estate bore the burden of establishing that it met the net worth limitations of the EAJA. *See Wilfong v. United States, supra,* 991 F.2d at 364 n. 7; *Pate v. United States,* 982 F.2d 457, 459 (10th Cir. 1993); *National Truck Equip. Ass'n v. National Highway Traffic Safety Admin.,* 972 F.2d 669, 671 (6th Cir.1992); *Love v. Reilly,* 924 F.2d 1492, 1494 (9th Cir.1991). In our view, that included the obligation to challenge the government's calculations if, in-

---

**6.** As the government suggests, the approach we have adopted does permit fluctuations in the market value of estate assets that occur between the decedent's death and the date of suit to be recognized in the net worth calculation. An estate with substantial securities or real estate holdings, for example, that exceeded the $2 million limit as of the decedent's death might nonetheless become eligible to recover its expenses if a market crash were to deflate the net worth of the estate to a figure below $2 million by the time suit was filed.

deed, the estate believed that the assets and liabilities had been tallied improperly. *See Publishers Resource, Inc. v. Walker–Davis Publications, Inc.*, 762 F.2d 557, 561 (7th Cir.1985). Having omitted to make or reserve any such argument, the estate is bound by the government's figures.

### III.

Based upon the plain language of the EAJA, Judge Brooks understandably concluded that he should calculate the value of the estate at the time that the lawsuit was commenced and should not consider any assets that had been distributed prior to that time. We believe, however, that the statutory language must be construed in its proper context—i.e., in light of the underlying purpose of the EAJA—and that the unique nature of estates requires us to consider the value of the estate as a whole and not just those assets remaining at the time that the action was commenced. As the undisputed record reveals that the net worth of the estate exceeded $2 million when all assets were included, the estate was ineligible to recover its litigation expenses.

REVERSED.