**RIVERS UNLIMITED, INC. et al.**

v.

**SCHREGARDUS.**

Ohio Court of Common Pleas,
Franklin County.

No. 95–CVH12–8797.

Decided March 3, 1997.

*E. Dennis Muchnicki* and *Joseph X. DiNovo,* for plaintiffs.

*Robert J. Karl, Margaret A. Malone* and *Andrew S. Bergman,* for defendant.

BEVERLY Y. PFEIFFER, Judge.

This matter is before the court on cross-motions for summary judgment filed by the parties on June 17, 1996. Opposing and reply memoranda have been filed. Upon the court's request, stipulations were filed on December 4, 1996 in order to

have a more fully developed record. The matter is now ready for the court's consideration.

Plaintiffs seek a declaratory judgment that R.C. 6111.12 violates both the Ohio and United States Constitutions. Plaintiffs assert that Section 15(D), Article II of the Ohio Constitution, the "one-subject rule," has been violated. Plaintiffs also claim that R.C. 6111.12(A)(3) violates the Supremacy and Commerce Clauses of the United States Constitution because the provision conflicts with the Federal Clean Water Act. In addition to declaratory relief, plaintiffs also seek an injunction prohibiting defendant from implementing R.C. 6111.12.

Plaintiffs' motion for summary judgment is supported by several affidavits. These affidavits cover three categories: plaintiffs' standing, the legislative process by which R.C. 6111.12 was enacted, and a public opinion poll. The court will not consider the public opinion poll, as it is in no way material to the pending motions.

Defendant's motion for summary judgment is supported by affidavits of Stephen Scoles, Deputy Director of Environmental Protection, and Daniel Dudley, Environmental Manager. These affidavits and exhibits attached thereto relate to the budget of the Ohio Environmental Protection Agency ("OEPA"). Also accompanying defendant's memorandum is plaintiffs' response to request for admissions.

Under Civ.R. 56, summary judgment is proper when "(1) [n]o genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party." *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 O.O.3d 466, 472, 364 N.E.2d 267, 274. Trial courts should award summary judgment with caution, being careful to resolve doubts and construe evidence in favor of the nonmoving party. *Murphy v. Reynoldsburg* (1992), 65 Ohio St.3d 356, 360, 604 N.E.2d 138, 141.

It is well settled that legislative enactments enjoy a presumption of constitutionality. *Beatty v. Akron City Hosp.* (1981), 67 Ohio St.2d 483, 493, 21 O.O.3d 302, 308, 424 N.E.2d 586, 592–593. When a statute is challenged as unconstitutional, a court must apply all presumptions and rules of construction so as to uphold the statute if at all possible. *State v. Dorso* (1983), 4 Ohio St.3d 60, 61, 4 OBR 150, 150–151, 446 N.E.2d 449, 450–451. A statute will be declared unconstitutional only if it "appears beyond a reasonable doubt that the legislation and constitutional provisions are clearly incompatible." *State ex rel. Dickman v.*

*Defenbacher* (1955), 164 Ohio St. 142, 57 O.O. 134, 128 N.E.2d 59. With these standards in mind, the motions for summary judgment will be considered.

## THE ONE–SUBJECT RULE

In addressing plaintiffs' challenge based on the one-subject rule, it is beneficial to first review the Ohio Supreme Court's interpretation of this constitutional provision and its purpose. The court in *State ex rel. Dix v. Celeste* (1984), 11 Ohio St.3d 141, 11 OBR 436, 464 N.E.2d 153, provided a comprehensive review of Section 15(D), Article II and standards of review for the courts. The court explained that the recognized purpose of the one-subject rule was to preclude several minorities from combining their provisions in a single act in order to obtain a majority vote for passage, a practice referred to as logrolling. *Id.* at 142, 11 OBR at 437–438, 464 N.E.2d at 155. The rule also serves as a bar to riders, that is, a provision not certain of passage attached to a bill that is, resulting in the provision not being adopted on its own merits. *Id.* at 143, 11 OBR at 438–439, 464 N.E.2d at 155–156.

The court has emphasized that the one-subject rule is directed at "disunity in subject matter." *Id.* at 146, 11 OBR at 441, 464 N.E.2d at 158, "The mere fact that a bill embraces more than one topic is not fatal, as long as a common purpose or relationship exists between the topics." *Hoover v. Bd. of Franklin Cty. Commrs.* (1985), 19 Ohio St.3d 1, 6, 19 OBR 1, 5, 482 N.E.2d 575, 580.

It has been consistently held by the Ohio Supreme Court that the constitutional provision is directory rather than mandatory. The rationale underlying this interpretation is that " '[i]t would be most mischievous in practice, to make the validity of every law depend upon the judgment of every judicial tribunal of the state as to whether an act or a bill contained more than one subject.' " *Dix,* 11 Ohio St.3d at 144, 11 OBR at 439, 464 N.E.2d at 156–157, quoting *Pim v. Nicholson* (1856), 6 Ohio St. 176, 180. This interpretation demonstrates the court's recognition and regard for the separation of powers between the judicial and legislative branches of government.

With these principles, the court has held:

"The one-subject rule contained in Section 15(D), Article II of the Ohio Constitution is merely directory in nature; while it is within the discretion of the courts to rely upon the judgment of the General Assembly as to a bill's compliance with the Constitution, a *manifestly gross and fraudulent violation* of this rule will cause an enactment to be invalidated." (Emphasis added.) *Dix, supra,* syllabus.

An example of such a violation is found in *Ohio AFL–CIO v. Voinovich* (1994), 69 Ohio St.3d 225, 631 N.E.2d 582. There the court reviewed a bill containing

appropriation provisions for the Bureau of Workers' Compensation and Industrial Commission, structural changes to those departments, substantive changes to workers' compensation laws, and creation of a new employment intentional tort and child labor exemption for the entertainment industry. The court there found that the provisions creating the new employment intentional tort and child labor exemption constituted a manifestly gross and fraudulent violation of the one-subject rule. *Id.* at 228, 631 N.E.2d at 585–586. In so finding, the court noted that these provisions had no relation to workers' compensation. *Id.* at 230, 631 N.E.2d at 587.

In applying the rule, the determination of whether a bill contains more than one subject is to be made on a case-by-case, semantic and contextual analysis. *Dix,* 11 Ohio St.3d at 145, 11 OBR at 440, 464 N.E.2d at 157–158. The issue to be decided here is whether R.C. 6111.12 possesses a common purpose or relationship to other topics in Am.Sub.H.B. No. 152, 145 Ohio Laws, Parts II and III, 3341.

Plaintiffs argue that because the bill contained over thirty separate provisions, was heard on one day of public testimony by the Senate Finance Committee, and was amended in conference committee without hearing, it necessarily violates the one-subject rule. In support of these contentions, plaintiffs attach affidavits that pertain to the legislative process followed in the enactment of R.C. 6111.12. Specifically, the affiants state that members of their respective organizations had testified and written letters on prior environmental legislation and would have done so on Am.Sub.H.B. No. 152, had the provision not been concealed.

Defendant disputes this evidence and supports his motion with evidence showing that members of plaintiffs' groups did present testimony and that no evidence has been presented showing a "manifestly gross and fraudulent" violation of the Ohio Constitution. Defendant further supports his motion with affidavits that the bill appropriated funds for operation of various programs of OEPA and its Division of Water Quality, including the antidegradation program. Plaintiffs do not dispute this evidence.

Based upon the affidavits and construing the evidence in accordance with Civ.R. 56, there is no dispute of fact that R.C. 6111.12 as enacted was contained in Am.Sub.H.B. No. 152, the biannual operations budget bill for fiscal years 1993 and 1994, an appropriations bill, and that the bill contained thirty various provisions. Further, it is not disputed that one day of testimony was heard by the Senate Finance Committee and that the provision was amended in conference committee without further hearing. Additionally, pursuant to the bill, funds were appropriated for the Ohio Environmental Protection Agency for its operations, including its regulatory and permit programs. R.C. 6111.12 is titled "Antidegradation policy applicable to surface waters of state; reviews" in Page's Ohio

Revised Code Annotated and "Antidegradation Policy" in Baldwin's Ohio Revised Code Annotated, and pursuant to its provisions the Director is to establish an antidegradation policy and to revise any necessary implementation procedures. These provisions clearly pertain to OEPA's regulatory programs, which were funded by the bill.

As was the case in *Dix, supra, ComTech Sys., Inc. v. Limbach* (1991), 59 Ohio St.3d 96, 570 N.E.2d 1089 (appropriations bill where taxation statutes were amended), and *Ohio AFL–CIO v. Voinovich* (1994), 69 Ohio St.3d 225, 631 N.E.2d 582 (appropriations bill where workers' compensation laws were reformed), it cannot be said as a matter of law that these two provisions, the appropriations and the substantive portion, are so unrelated as to constitute a "manifestly gross and fraudulent violation" of Section 15(D), Article II, nor does it appear beyond a reasonable doubt that the legislation and constitutional provision are clearly incompatible. Like the bills in *Dix, ComTech* and *Ohio AFL–CIO,* the appropriation is the means by which the act is carried out, and the joinder of the two does not destroy the singleness of subject. *Dix,* 11 Ohio St.3d at 146, 11 OBR at 440– 441, 464 N.E.2d at 158.

Accordingly, plaintiffs' motion for summary judgment based upon Section 15(D), Article II of the Ohio Constitution is denied, and defendant's motion for summary judgment on that claim is granted.

## CONFLICT WITH FEDERAL LAW

Plaintiffs second claim is that R.C. 6111.12(A)(3) conflicts with federal law and that they are therefore entitled to summary judgment as a matter of law. Plaintiffs specifically argue that the statutory provision granting the Director authority to allocate up to eighty percent of a waterway's "pollutant assimilative capacity" to "existing sources" where the "current ambient water quality" is of a higher quality than prescribed in the standards without "antidegradation review" conflicts with federal law. The conflicts identified by plaintiffs are that federal law requires (1) prior public hearing and notice and (2) a demonstration that the increased pollution is necessary to accommodate important economic and social development. Plaintiffs rely on the Ohio Supreme Court's decision in *Columbus & Franklin Cty. Metro Park v. Shank* (1992), 65 Ohio St.3d 86, 600 N.E.2d 1042, to support this claim.

Four inquiries are raised in relation to this issue. First, does federal law preempt this area of legislation? Second, if so, what does the federal law require? Third, what does the state legislation provide? Fourth, does the state law conflict with the federal law?

■ Although it is not disputed by defendant that federal law does preempt the area of water pollution control legislation, a brief analysis of that issue is beneficial. While "courts should not lightly infer pre-emption, it may be presumed when the federal legislation is 'sufficiently comprehensive to make reasonable the inference that Congress "left no room" for supplementary state regulation.'" (Footnote omitted.) *Internatl. Paper Co. v. Ouellette* (1987), 479 U.S. 481, 491, 107 S.Ct. 805, 811, 93 L.Ed.2d 883, 896. The United States Supreme Court has noted that the Clean Water Act and its amendments were "the most comprehensive and far reaching" and the federal legislation occupied the field. *Id.* at 489, 107 S.Ct. at 810, 93 L.Ed.2d. at 895. The court had reached this conclusion in an earlier case, finding that Congress intended to "establish an all-encompassing program of water pollution regulation." *Milwaukee v. Illinois* (1981), 451 U.S. 304, 318, 101 S.Ct. 1784, 1793, 68 L.Ed.2d 114, 127. Accordingly, this court finds there is no dispute of fact that the Federal Clean Water Act does preempt this area of legislation.

■ As a result, when federal legislation is so dominating, any state law in the field must be in accord. Where state law " 'actually conflicts with a * * * federal statute,' " that law is invalid. *Internatl. Paper*, 479 U.S. at 491, 107 S.Ct. at 811, 93 L.Ed.2d at 896, quoting *Ray v. Atlantic Richfield Co.* (1978), 435 U.S. 151, 158, 98 S.Ct. 988, 994–995, 55 L.Ed.2d 179, 188–189. That type of a conflict exists when the state law " 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Hillsborough Cty. v. Automated Med. Laboratories, Inc.* (1985), 471 U.S. 707, 713, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714, 721, quoting *Hines v. Davidowitz* (1941), 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581, 586–587. Thus, it must be determined whether the challenged provision, R.C. 6111.12(A)(3), " 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives'" of the Federal Clean Water Act.

To make this determination it is necessary to first determine the purposes and objectives of the Clean Water Act.[1] The Act is a comprehensive statute designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" and to obtain "water quality which provides for the protection and propagation of fish, shellfish, and wildlife." Section 1251(a)(2), Title 33, U.S. Code.

To achieve these purposes different roles are established for state and federal governments. The United States Environmental Protection Agency is to estab-

---

1. For a most thorough review of the legislative history relating to the Clean Water Act, see *Columbus & Franklin Cty. Metro. Park Dist. v. Shank* (1992), 65 Ohio St.3d 86, 600 N.E.2d 1042, Appendix.

lish and enforce limitations on discharges of pollutants into the nation's navigable waters. Sections 1311 and 1314, Title 33, U.S. Code. This is accomplished through the National Pollutant Discharge Elimination System's ("NPDES") permit process. Under this system, dischargers (sources of pollutants) have established effluent limits, that is, amounts of pollutants which are permitted to be discharged. The NPDES permit is an exception to the Act's general prohibition against discharge of pollutants into waters. The NPDES permit process is part of the states' regulatory responsibilities.

State agencies are required to develop and implement comprehensive water quality standards that establish water quality goals for interstate waters. Sections 1311(b)(1)(C) and 1313, Title 33, U.S. Code. The water quality standards consist of two components. The first component is the water's use or function. For example, a body of water may have a use designation of recreation or provision for wildlife habitat. The second component is the criteria that determine the specific pollution levels compatible with a use. *Metro. Park Dist.* at Appendix; Section 1313(c)(2)(A), Title 33, U.S. Code. States are not left on their own in setting standards but must set standards that "protect the public health or welfare, enhance the quality of water and serve the purposes of this chapter. Such standards shall be established taking into consideration their use and value for public water supplies, propagation of fish and wildlife, recreational [and other purposes]." *Id.*

The final aspect of the Clean Water Act requires states to establish an antidegradation policy. Section 131.12, Title 40, C.F.R. The purpose of the policy is to *maintain and protect* high quality waters. The federal regulation requires that, at a minimum, the policy must be consistent with the following:

"Where the quality of the waters exceeds levels necessary to support propagation of fish, shellfish, and wildlife and recreation in and on the water, that quality *shall be maintained and protected unless the State finds, after full satisfaction of the intergovernmental coordination and public participation provisions of the State's continuing planning process, that allowing lower water quality is necessary to accommodate important economic or social development in the area in which the waters are located.* In allowing such degradation or lower water quality, the State shall assure water quality adequate to protect existing uses fully. Further, the State shall assure that there shall be achieved the highest statutory and regulatory requirements for all new and existing point sources and all cost-effective and reasonable best management practices for nonpoint source control." (Emphasis added.) Section 131.12(a)(2), Title 40 C.F.R.

The antidegradation standard was incorporated into law by 1987 amendments to the Act, and provided:

"Limitations on revision of certain effluent limitations.

" * * *

"Standard attained.—For waters identified under paragraph (1)(A) where the quality of such waters equals or exceeds levels necessary to protect the designated use for such waters or otherwise required by applicable water quality standards, any effluent limitation based on a total maximum daily load or other waste load allocation established under this section, or any water quality standard established under this section, or any other permitting standard *may be revised only if such revision is subject to and consistent with the antidegradation policy established under this section.*" (Emphasis added.) Section 1313(d)(4)(B), Title 33, U.S. Code.

In essence, the antidegradation rule serves the purpose of ensuring that bodies of water which have had their quality improved through years of antipollution efforts are not permitted to backslide, reversing those years of improvements, except under limited circumstances.

In interpreting the federal law provisions pertaining to antidegradation, the Ohio Supreme Court has stated:

"The Ohio antidegradation policy is required by federal law, and state law, to conform to federal water quality standards. These standards require the establishment of an antidegradation policy that generally prohibits any deterioration of water quality even where the existing level exceeds that necessary to support a designated use.

" * * *

"The requirements of the Federal Clean Water Act are comprehensive and interconnected. The guiding principle of the Act is that discharge of pollutants into the waters of the nation is unlawful. As an exception to this general prohibition, the Act permits discharge where the point source possesses an NPDES permit authorizing the activity. * * * [A] point source may not discharge effluent which would violate the applicable water quality standards. * * * Generally, a permit that allows violation of a water quality standard is prohibited. However, Section 131.12, Title 40, C.F.R. allows limited degradation after compliance with the 'public participation provisions of the State's continuing planning process.' * * * Therefore, * * * federal law requires these procedural safeguards before degradation may be permitted." *Columbus & Franklin Cty. Metro. Park Dist. v. Shank,* 65 Ohio St.3d at 100, 600 N.E.2d at 1055.

The court held that degradation of high quality waters occurs whenever there is an increased amount of pollutants. *Id.* at 103, 600 N.E.2d at 1056–1057, paragraph two of the syllabus. The court held the federal law to require that a permit that authorized an activity that would degrade waters could not be issued

"unless (1) he [the Director] has complied with the public notice and intergovernmental coordination requirements of Parts 25 and 29, Title 40 C.F.R., (2) he has conducted a public hearing to consider the technical, economic and social criteria provided in Sections 1311 and 1312, Title 33, U.S. Code, and (3) as a result of the public hearing, he has chosen to allow lower water quality in the receiving stream. Where this determination has been made, the degradation of water quality must be kept to an absolute minimum by the employment of the most stringent statutory and regulatory controls for waste treatment and under no circumstances may such degradation interfere with or become injurious to any existing or planned uses of the receiving waters." *Metro. Park Dist.*, paragraph one of the syllabus.

Part 25, Title 40, C.F.R. sets forth provisions for public participation in programs under the Clean Water Act. The regulation provides that activities covered by the provision include issuance and modification of permits. Section 25.3(a), Title 40, C.F.R. The regulation goes on to explain:

"Public participation is that part of the decision-making process through which responsible officials become aware of public attitudes *by providing ample opportunity* for interested and affected parties to communicate their views. Public participation includes *providing access* to the decision-making process, *seeking input* from and *conducting dialogue* with the public, assimilating public viewpoints and preferences, and demonstrating that those viewpoints and preferences have been considered by the decision-making official. * * * Public agencies should encourage full presentation of issues at an early stage so that they can be resolved and timely decisions can be made. In the course of this process, responsible *officials should make special efforts to encourage and assist participation* by citizens representing themselves and by others whose resources and access to decision-making may be relatively limited." (Emphasis added.) Section 25.3(b), Title 40, C.F.R.

The objectives of Part 25 are the following:

"(1) To assure that the public has the opportunity to understand official programs and proposed actions, and that the government fully considers the public's concerns;

"(2) To assure that the government does not make any significant decision on any activity covered by this part without consulting interested and affected segments of the public;

"(3) To assure that government action is as responsive as possible to public concerns;

"(4) To encourage public involvement in implementing environmental laws;

"(5) To keep the public informed about significant issues and proposed project or program changes as they arise;

"(6) To foster a spirit of openness and mutual trust among EPA, States, substate agencies and the public; and

"(7) To use all feasible means to create opportunities for public participation, and to stimulate and support participation." Section 25(c)(1), Title 40, C.F.R.

In summary then, federal law requires that waters of high quality *shall* be maintained and protected unless, after full satisfaction of public participation provisions, it is demonstrated that lower quality is necessary to accommodate important economic and social development. The requirements of federal law having been determined, the next step is to review the state law.

The introductory paragraph of R.C. 6111.12 provides:

"The director of environmental protection shall establish an antidegradation policy applicable to surface waters of the state pursuant to applicable federal laws and regulations. The purpose of the policy shall be to maintain levels of water quality that are currently better than prescribed by applicable standards except in situations when a need to allow a lower level of water quality is demonstrated based on a technical, social, and economic criteria. * * *"

The portion of R.C. 6111.12 challenged by plaintiffs states:

"Whenever current ambient water quality is determined to be of a higher quality than prescribed in the standards, on a pollutant-by-pollutant basis, and the water body lacks exceptional recreational or ecological value, *the director may allocate to existing sources eighty per cent of the pollutant assimilative capacity* as determined by appropriate total maximum daily load procedures *without further antidegradation review.*" (Emphasis added.) R.C. 6111.12(A)(3).

"Antidegradation review" is defined in the statute as "the consideration by the director of the technical, social, and economic need demonstration completed by any person requesting to lower water quality * * * including the public notice of the application and, at the discretion of the director, a public hearing on it." R.C. 6111.12(C)(3).

The parties have stipulated the following:

" 'Assimilative capacity' is the stream's *ability to assimilate certain amounts of pollutants without the presence of those pollutants adversely affecting the stream's ability to attain and maintain its designated use.* The assimilative capacity of a stream is determined by using specific water quality criteria in

O.A.C. 3745–1–07 which establish the minimum water quality required to achieve and maintain the designated uses."[2] (Emphasis added.)

In other words, assimilative capacity is the water body's ability to take on an increased number of pollutants without the use designation being altered.

An "existing source" is "any treatment works that were built and operational under the terms of an NPDES permit prior to the effective date of this section." R.C. 6111.12(C)(1). The effective date of the statute was July 1, 1993.[3]

In summary, the state provision permits the Director to allow degradation by using up to eighty percent of a water body's assimilative capacity to establish effluent limits without public notice or hearing and without a demonstration that degradation is necessary to accommodate important social and economic development.

Plaintiffs move for summary judgment based on the statute's conflict with the Federal Clean Water Act in that the federal act, as interpreted by the Ohio Supreme Court in *Columbus & Franklin Cty. Metro. Park Dist., supra,* 65 Ohio St.3d 86, 600 N.E.2d 1042, requires that before degradation of high quality waters may be allowed the Director must (1) comply with public notice and hearing and (2) find the existence of important technical, economic and social need for allowing degradation. *Id.* at paragraph one of the syllabus.

Defendant opposes plaintiffs' motion and moves for summary judgment, contending that R.C. 6111.12(A)(3) does not conflict with federal law because (1) R.C. 6111.12 requires the antidegradation policy to be consistent with federal law and states that the purpose is to maintain levels of water quality that exceed standards except where a need to lower the quality is found based on social and economic criteria and (2) the federal law does not require public hearing but merely requires satisfaction of the public-participation provision of the state's continuing planning process. Defendant also contends that the Supreme Court's holding in *Metro. Park Dist.* is not binding on the legislature or this court because it merely interpreted the prior antidegradation rule and that plaintiffs inappropriately rely on the text of that decision as opposed to the court's syllabus.

The court will first address defendant's contention that the Supreme Court's holding is not binding. Rulings of the state's highest court are controlling and binding upon court's of inferior jurisdiction. *Consol. Rail Corp. v. Forest Cartage*

---

2. The method for calculating the assimilative capacity of a given body of water is described in the parties' stipulations.

3. Defendant indicates there are one hundred twenty-six such sources. Affidavits of Jennifer Leshnock and Mark Mann.

*Co.* (1990), 68 Ohio App.3d 333, 341, 588 N.E.2d 263, 268. Similarly, to the extent the Ohio Supreme Court has interpreted federal law and its decision has not been reversed, the legislature is bound by that interpretation. Accordingly, defendant's argument on this basis is not well taken.

With respect to defendant's argument that the *Metro. Park Dist.* decision merely interpreted the prior antidegradation rule, that is not correct. The court addressed the agency's *interpretation* of the state's antidegradation rule. *Metro. Park Dist., supra,* 65 Ohio St.3d at 96, 600 N.E.2d at 1052. The court specifically stated it was the agency's interpretation of the rule, not the rule itself, that conflicted with the federal law. *Id.* at 100, 600 N.E.2d at 1054–1055. The interpretation by the agency was that the rule permitted "deterioration to a point short of interference with the designated use" of a waterway. *Id.*

The Director had contended that because there would not be any interference with the existing designated use of the affected stream no public hearing was needed. The court specifically rejected the argument and held that degradation, an increased amount of pollutants, was not permissible unless there was public notice and public hearing and a determination of need to allow degradation to accommodate important social development and economic needs. *Id.* at paragraphs one and two of the syllabus. The Supreme Court reached this holding based on its interpretation of the federal law:

"The unambiguous meaning of the * * * federal rules is that any deterioration of high quality water violates the policy. The existing ambient condition of the receiving stream thus establishes the applicable water quality standard with which a potential discharger must comply. * * * *The antidegradation policy, however, provides a narrow exception to this rule. Limited degradation of high quality waters is permissible but only after compliance with the public hearing requirement of the rule and an administrative decision based thereon that technical, economic and social factors justify the degradation.*" (Emphasis added.) *Id.* at 110–111, 600 N.E.2d at 1061–1062.

Accordingly, while *Metro. Park Dist.* did involve the agency's prior rule, the court interpreted the agency's interpretation of that rule, and its findings regarding the federal law requirements are binding and applicable to the case at bar.

Defendant also contends that R.C. 6111.12(A)(3) does not conflict with federal law because the statute itself requires the antidegradation policy to comply with federal law and states that its purpose is to maintain levels of water quality except when a need to reduce quality is shown based on technical, social, and economic criteria. Defendant goes so far as to say that because this is stated in the statute it will ensure compliance with federal law. Defendant's argument is that because the statute says it must comply, it does. The fact that the statute

states that there must be compliance with federal law does not in and of itself mean that the challenged portion does comply with federal law. It is still necessary to compare the challenged provision with the federal law to determine if there is a conflict. The question in this regard is whether the statute's provision that excepts from antidegradation review additional discharges of up to eighty percent of a waterway's pollutant assimilative capacity is an obstacle to the purposes and objectives of the federal act.

As noted, antidegradation review is defined in R.C. 6111.12(C)(3) as the consideration by the Director of the demonstration of technical, social, and economic need made when any person is requesting to degrade water quality, and includes the public notice of the application and public hearing. The end result is that R.C. 6111.12(A)(3) allows an antidegradation policy that permits the Director to permit lower water quality (an increase in pollutants) by allowing up to eighty percent of a waterway's assimilative capacity to be used and to take this action without antidegradation review, that is, without consideration of the economic and social need and without public notice and hearing.

Defendant does not dispute that the provision allows use of up to eighty percent of a waterway's pollutant assimilative capacity to determine effluent limits which results in degradation and does not dispute that this action can occur without the demonstration of social and economic need and without notice and hearing.

Defendant contends that the state law does not conflict with federal law because federal law does not require public notice and hearing prior to reducing water quality but rather requires only that the reduction be consistent with the public participation provisions of the state's continuing planning process. Defendant cites the federal statute, Section 1313(d)(4)(B), Title 33, U.S. Code and the federal regulation, Section 131.12, Title 40, C.F.R. in support of this contention. Defendant adds that public comment is provided as part of the rulemaking process that would occur during the promulgation of a new antidegradation policy. Defendant does not cite any portion of the public participation provisions of the state's continuing planning process and does not present evidence as to what provision or provisions of that document with which R.C. 6111.12(A)(3) is consistent.

The current Continuing Planning Process dates to August 1989.[4] The public-participation provision is captioned "Public Involvement." The section provides, in part, "Ohio EPA considers public involvement to be an integral part of

---

4. Because the Continuing Planning Process, a public record, is not easily accessible and consists of numerous appendices, the court attaches the "Public Involvement" provision as Appendix A.

developing and implementing a strategy to accomplish the goals of Ohio statutes and the Clean Water Act in this State. The public involvement program attempts to solicit both formal and informal citizen opinion in Agency program development including proposed regulation and permits."

There are six stated aspects of public involvement. Two of these are public information meetings and public hearings. Public information meetings "are held for various permits and program activities and policies in advance of Agency decisions." It is stated, with respect to "public hearings," that "[t]hese are held for permits issued upon request of the public * * *." Both provisions contain public notice provisions.

Thus, even assuming that defendant is only required to conduct this activity in a manner consistent with the Continuing Planning Process public-participation provisions and that *Metro. Park Dist.* and Part 25, Title 40, C.F.R. do not apply, R.C. 6111.12(A)(3) does not even comply with the state's Continuing Planning Process provisions, as the statute specifically allows the decision of the Director to be made without notice or hearing. Defendant does not explain how "public participation" as it is described in the Continuing Planning Process can occur where there is no public notice or hearing of the proposed action.

Other than his assertion that federal law does not require notice and hearing, defendant cites no case law in support and does not explain why Part 25, Title 40, C.F.R. does not apply. The assertion is clearly inapposite to the public-participation provisions of Part 25, Title 40, C.F.R., which require "providing ample opportunity" for the public to express its views, providing public access to the decisionmaker, and seeking input from the public. Moreover, this contention is in complete contradiction to the Supreme Court's ruling in *Metro. Park Dist.*:

"The Ohio Director of Environmental Protection may not issue a permit authorizing an activity that would degrade waters which exceed water quality standards unless (1) he has complied with the public notice and intergovernmental coordination requirements of Parts 25 and 29, Title 40, C.F.R., (2) he has conducted a public hearing to consider the technical, economic and social criteria provided in Sections 1311 and 1312, Title 33, U.S. Code, and (3) as a result of the public hearing, he has chosen to allow lower water quality in the receiving stream. Where this determination has been made, the degradation of water quality must be kept to an absolute minimum by the employment of the most stringent statutory and regulatory controls for waste treatment and under no circumstances may such degradation interfere with or become injurious to any existing or planned uses of the receiving waters." *Columbus & Franklin Cty. Park Dist., supra,* 65 Ohio St.3d 86, 600 N.E.2d 1042, at paragraph one of the syllabus.

■ Simply put, if the state could permit degradation without public notice and hearing where a stream's use designation is not affected, it would render meaningless the comprehensive nature of the Federal Clean Water Act and its purposes and objectives both in relation to water pollution control efforts and public participation requirements. Pursuant to federal law, waters of a quality exceeding levels necessary to support a certain use designation *shall* have that quality maintained and protected. *Id.* The very means by which Congress chose to maintain and protect such waters was to enact federal provisions that require states to develop antidegradation policies that require, at a minimum, public participation and a finding that degradation is necessary to accommodate important economic or social development in the area. Section 131.12(a)(2), Title 40, C.F.R. Clearly, R.C. 6111.12(A)(3) fails to comport with these requirements, as it allows the Director to lower a stream's water quality by assigning as much as eighty percent of the stream's pollutant assimilative capacity without antidegradation review, that is, without public participation and without determination of social and economic need. This provision "stands as an obstacle to the accomplishment and execution of the full purposes and objectives" of federal water pollution control laws.

Based on the aforementioned, defendant's motion for summary judgment on the conflict with federal law issue is found not well taken and is denied, and plaintiffs' motion for summary judgment on the claim is granted. Accordingly, the court finds and declares that R.C. 6111.12(A)(3)'s provision that allows the Director to allocate as much as eighty percent of a waterway's pollutant assimilative capacity to existing sources without antidegradation review conflicts with federal law and therefore violates the Supremacy and Commerce Clauses of the United States Constitution and is therefore declared invalid. The offending portion is severed to cure the defect and save the remaining portions. See *State ex rel. Hinkle v. Franklin Cty. Bd. of Elections* (1991), 62 Ohio St.3d 145, 149, 580 N.E.2d 767, 770–771. It is hereby ordered that defendant is enjoined from taking any action pursuant to the invalid provision.

*So ordered.*

## APPENDIX

Excerpt from Continuing Planning Process (Ohio Environmental
Protection Agency, August 1989) IV–25 to IV–27

### PUBLIC INVOLVEMENT

Ohio EPA considers public involvement to be an integral part of developing and implementing a strategy to accomplish the goals of Ohio statutes and the Clean Water Act in this State. The public involvement program attempts to

solicit both formal and informal citizen opinion in Agency program development including proposed regulations and permits. Response summaries are used at appropriate consultation points to inform the public of the consideration given to their comments.

The Public Involvement Coordinator is responsible for developing Agency public involvement policy, overseeing policy implementation, conducting general public involvement activities for the water and all other divisions.

There are six main facets to the Public Involvement Program:

1.  Public Information Meetings: These are held for various permits and program activities and policies in advance of Agency decisions to inform local citizens about the programs and how they can be involved. They are informal sessions where, in most instances, people can go from table to table to talk with Ohio EPA employees on a one-to-one basis. These meetings have proven to be quite effective over the past year and a half in communicating our efforts in a less threatening environment and in deciphering public concerns early in the decision-making process. Notification appears in newspapers, *Dialogue* and the *Weekly Review*. They are held voluntarily or upon public request.

2.  Public Hearings: These are held for permits issued upon request of the public or voluntarily by the Agency for program sensitive or site-specific sensitive situations, regulations promulgated, water quality standards revisions, ground water strategy revisions, program developments and in response to formal complaints as provided by law. Notification appears in newspapers through public notice and press releases, and in the *Weekly Review*.

3.  Director's Public Advisory Council: The Agency-established Public Advisory Groups are being phased out and are being replaced by a Director's Public Advisory Council. Other task forces which are initiated under State strategy (Inter-Agency Ground Water Advisory Council), formed by executive order (State Advisory Council), will continue to be coordinated under the Public Involvement Program.

[IV-26]

4.  Remedial Action Plans (RAPs): RAPs are coordinated by the Agency for four rivers in northern Ohio: Ashtabula, Black, Cuyahoga and Maumee. Public involvement programs are in various states for these sites.

A.  *Ashtabula River*: An Advisory Council, Technical Committee and Communications Committee meet bi-monthly to aid Ohio EPA in developing and, later, implementing a RAP. Council members have been actively supportive of efforts to resolve problems in their area: launched a letter campaign to legislators, met with federal officials in Washington, D.C., and are engaged in funding coordina-

tion efforts to encourage the successful dredging of the river. A newsletter is published quarterly.

B. *Black River*: Although a public involvement program is not active at this time, one will be formed to assess the effectiveness of the remedial measures in progress.

C. *Cuyahoga River*: A Coordinating Committee, Steering Committee, Policy Advisory Group, Communications Committee and specialized technical committees meet monthly or bi-monthly and are very active in coordinating opportunities for community involvement. A Speakers' Bureau program has been established, publicity events held, tours conducted, and a brochure highlighting the activities of the RAP published. The Northeast Ohio Areawide Coordinating Agency is assisting Ohio EPA with RAP committee activities.

D. *Maumee River*: An Advisory Committee meets bi-monthly to review the progress of seven issue-oriented subcommittees. The water quality assessment work is complete and will serve as the basis for development of general recommendations for pollution control measures in the Maumee Area of Concern. The Communications Committee and the agency jointly are preparing a slide presentation for a Speakers' Bureau and a newsletter. The Toledo Metropolitan Area Council of Governments is assisting Ohio EPA in coordination of the RAP activities.

5. Superfund and State-coordinated Site Cleanup Plans: The Agency supports USEPA with its Superfund Community Relations program. In addition, since the Agency is developing a State-coordinated site cleanup, we are developing a formal community relations program for that effort.

6. Public Informational Materials: Materials include newsletters, brochures, fact sheets, and meeting minutes which are all program, task force or permit site-specific related. To provide information on proposed and final Agency actions, the Ohio EPA prepares public notices and press releases, and publishes the *Weekly Review* which is sent to some 250 subscribers around the State. In addition, the *Weekly Review* contains notices of public hearings, promulgation of regulations, enforcement actions and other matters of interest to the public.

*Response to Public Involvement Task Force:*

A Public Involvement Task Force was formed in 1987 to review the Agency's Public Involvement program and to make recommendations for improvement. As a result of these recommendations, the Agency has initiated several activities and new facets to the program.

[IV-27]

*Dialogue*, the Agency's new newsletter for the Public Advisory Group membership, is designed to respond to some of the needs and issues raised. *Dialogue* will provide information on Agency programs and policies, ongoing public involvement activities and meeting dates of interest to the public. Its first publication was June 1989.

A Director's Public Advisory Council is being formed, composed of twenty representatives of the public representing various interests and elected community. It will meet regularly with the Director to discuss Agency programs and policies previously presented to the Public Advisory Group Task Forces. It will be involved directly in the upcoming environmental bond issue, and will review the Agency's biennium budgets. This Council will phase out the former Public Advisory Group Task Forces. The water task forces remained active in 1989; however, with proposed Surface Water Quality Standards Rules, proposed public drinking water rules, and proposed State Revolving Loan fund legislation. A Budget Priorities Task force was formed in 1988 to review and recommend priorities during the development of the Agency's latest biennium budget.

Public information meetings are held in advance of numerous hearings, fact sheets are available at many public hearings or public information sessions, upper management attends significant public hearings and meetings, responsiveness summaries are prepared for selected public information meetings, the policy for inspection of the Agency's public records is being revised, the format, content and distribution of the *Weekly Review* is being reviewed, and new educational brochures are being prepared.

*Water Quality Management Basin Policy Advisory Committees*

Water Quality Management Policy Advisory Committees have been established in each designated and nondesignated Water Quality Management planning area. The membership of these committees varies across the State, both in size and make-up, but each committee must open its membership to existing local management agencies and any newly designated agencies. Efforts are being made in each planning area to include private citizens, economic interests and special interest groups to achieve a balance of interest.

These basin oriented Policy Advisory Committees have responsibility to evaluate:

1. alternative plan objectives and Water Quality Management strategies;

2. environmental attributes to be protected, enhanced and/or preserved;

3. the recommended Water Quality Management Plan and program including:

a. county and small area population projections and requests for revisions to Ohio EPA,

b. wasteload allocations and requests for variances to Ohio EPA,

c. mechanisms to develop and select local Water Quality Management alternatives,

d. recommendations for management agencies and management structures;

4. public coordination and information programs; and

5. other ongoing planning programs related to Water Quality Management in the planning area.