# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-2445

_____

Forest Park II, a Minnesota Limited　　*
Partnership,　　　　　　　　　　　　　*
　　　　　　　　　　　　　　　　　　*
　　　　　　　Plaintiff/Appellant,　　*
　　　　　　　　　　　　　　　　　　*
　　　　　　　v.　　　　　　　　　　*
　　　　　　　　　　　　　　　　　　*
Katherine Hadley, in her capacity as　*
Commissioner of the Minnesota　　　 *
Housing Finance Agency;　　　　　　*
City of Forest Lake, Minnesota;　　　 *
Minnesota Metropolitan Council;　　　*
Forest Part II Tenants Association;　　*　　Appeals from the United States
Richard Psyck; Jeremy Cahill;　　　　*　　District Court for the
Cassandra Johnson; Tara Wood;　　　 *　　District of Minnesota.
Dawn Byland; Nicole Cook; John　　　*
Hill; Teressa Barnett; Jennifer Rauito;　*　　[PUBLISHED]
Margie Barnett; Carolyn Brown;　　　*
Anthony Wallin; Gwen Beto;　　　　　*
Christine Green; Andrew Clover;　　　*
Diana Dehn, Debra Renollet; Jesse　　*
Rose; Nathan Malchow; Loann　　　　*
Matheson; Crystal Olson; Tammy　　　*
Breidel; Tamara Boyer; Travis　　　　*
Wiosky; Andrew Schneider, Jason　　　*
Wilkinson; Susan Eidet; Deana　　　　*
Schwefel; Jon Hatanpa; Linnea Cook;　*
Patricia Thompson; Aleeta　　　　　　*
Gelbmann; Derek Sagerer; Cheryl　　　*

Mitchell; Alyce Reed; Kimberly     *
Turcotte; Rachael Nelson; Constance     *
Letourneau; Teresa White; Mary     *
Bartel; Lindsay Stumm; Anthony     *
Minwegen; Janson Rossell; Orenna     *
Powell; Antoinett Smith; Nicole     *
Kichler; Paul Henry; Petranell     *
Berggren; Craig Metcalf; Tammy     *
Russ; Susan Trudeau; Joseph Greene;     *
Tammy Sanz; Nicholas Theis; Megan     *
Theis,     *
    *
         Defendants/Appellees.     *
    *
Family Housing Fund,     *
    *
         Intervenor/Appellee.     *
    *
----------------------------------------------     *
    *
California Coalition for Rural     *
Housing,     *
    *
         Amicus on Behalf     *
         Of Appellees.     *
    *
    *

_____

No. 02-2609
_____

Troy Durant; Jeannette Forga,     *
    *
         Defendants/Appellants     *
    *
      v.     *

                                                    *

Katherine Hadley, in her capacity as   *
Commissioner of the Minnesota   *
Housing Finance Agency;   *
City of Forest Lake, Minnesota;   *
Minnesota Metropolitan Council;   *
Forest Part II Tenants Association;   *
Richard Psyck; Jeremy Cahill;   *
Cassandra Johnson; Tara Wood;   *
Dawn Byland; Nicole Cook; John   *
Hill; Teressa Barnett; Jennifer Rauito;   *
Margie Barnett; Carolyn Brown;   *
Anthony Wallin; Gwen Beto;   *
Christine Green; Andrew Clover;   *
Diana Dehn, Debra Renollet; Jesse   *
Rose; Nathan Malchow; Loann   *
Matheson; Crystal Olson; Tammy   *
Breidel; Tamara Boyer; Travis   *
Wiosky; Andrew Schneider, Jason   *
Wilkinson; Susan Eidet; Deana   *
Schwefel; Jon Hatanpa; Linnea Cook;   *
Patricia Thompson; Aleeta   *
Gelbmann; Derek Sagerer; Cheryl   *
Mitchell; Alyce Reed; Kimberly   *
Turcotte; Rachael Nelson; Constance   *
Letourneau; Teresa White; Mary   *
Bartel; Lindsay Stumm; Anthony   *
Minwegen; Janson Rossell; Orenna   *
Powell; Antoinett Smith; Nicole   *
Kichler; Paul Henry; Petranell   *
Berggren; Craig Metcalf; Tammy   *
Russ; Susan Trudeau; Joseph Greene;   *
Tammy Sanz; Nicholas Theis; Megan   *
Theis,   *
  *
          Defendants/Appellees.   *
  *

Family Housing Fund,                          *
                                              *
              Intervenor/Appellee.            *
                                              *
---------------------------------------       *
                                              *
California Coalition for Rural                *
Housing,                                      *
                                              *
              Amicus on Behalf                *
              Of Appellees.                   *
                                              *

_____

Submitted:  February 13, 2003
Filed:  July 17, 2003
_____

Before HANSEN,[1] Chief Judge, RICHARD S. ARNOLD and BYE, Circuit Judges.
_____

HANSEN, Circuit Judge.

Appellants Forest Park II (Forest Park), Troy Durant, and Jeannette Forga appeal the district court's grant of summary judgment and its issuance of a permanent injunction requiring Forest Park to comply with various Minnesota state statutes before prepaying its federally subsidized mortgage. Because we hold that the state statutes are preempted, we reverse.

---

[1]The Honorable David R. Hansen stepped down as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on March 31, 2003. He has been succeeded by the Honorable James B. Loken.

# I. Facts & Background

Forest Park owns an apartment building that was financed with a federally subsidized mortgage and has operated it for 25 years providing low-income housing. Forest Park sought to prepay its mortgage and withdraw from the federal program pursuant to the provisions of federal law. After receiving advice from a tenants' rights group, a number of tenants insisted that Forest Park comply with two Minnesota statutes before withdrawing from the federal program.

Forest Park then commenced this declaratory judgment action seeking a declaration that the two Minnesota statutes are preempted by federal law, and that they violate the Contracts Clause of the federal Constitution. Forest Park named a number of individual tenants as well as the Minnesota Housing Finance Agency and the Metropolitan Council as defendants. The district court also allowed a nonprofit tenants' rights organization, the Family Housing Fund, to intervene. The defendants brought an immediate motion for summary judgment and requested an injunction prohibiting Forest Park from prepaying its mortgage without first complying with the state statutes.

The district court granted the defendants' motion for summary judgment, finding that federal law does not preempt the Minnesota statutes, and it issued a permanent injunction prohibiting Forest Park from prepaying the mortgage until it fully complies with the state statutes. See Forest Park II v. Hadley, 203 F. Supp. 2d 1071, 1077-78 (D. Minn. 2002). Forest Park appeals, joined by two individual tenants who apparently stand to benefit from other federal programs if Forest Park can prepay its mortgage.

## II.  The Federal Housing Programs[2]

In the 1960s, Congress established a number of programs whereby the federal government enticed private developers to build inexpensive, affordable housing for low-income citizens to occupy by offering the developers loans with below-market interest rates.  Forest Park participated in the "Section 236" program created in 1968. See Housing and Urban Development Act of 1968, Pub. L. No. 90-448, §§ 201(a), 236(a)-(g), 82 Stat. 476, 498 (codified as amended at 12 U.S.C. § 1715z-1 (2000)). The Section 236 program ended in 1973.  See Pa. v. Lynn, 501 F.2d 848, 850-51 (D.C. Cir. 1974) (explaining the suspension).  Under this program, the federal Department of Housing and Urban Development (HUD) both insured and subsidized the interest payments on mortgages for multifamily housing projects.  Project owners executed 40-year mortgages with interest rates of 1 to 3 percent; however, the mortgage and the related regulatory agreement entered into with HUD expressly granted the mortgagor the right to prepay the outstanding mortgage balance after 20 years without the prior consent of HUD.  With the incentives of low interest rates and early prepayment opportunities, hundreds of thousands of housing units were built under these programs in the 1960s and early 1970s.

Because the owners had an absolute right of prepayment after twenty years, in the 1980s Congress began to fear that a flood of repayments would overburden the existing housing shortage.  In 1987, it enacted the Emergency Low Income Housing Preservation Act of 1987 (ELIHPA), Pub. L. No. 100-242, §§ 201 et seq., 101 Stat. 1815, 1877-78 (previously codified at 12 U.S.C. § 1715l note (1988)).  ELIHPA authorized HUD to offer additional incentives to mortgagors to discourage prepayment and to set strict conditions of prepayment for those who chose to forego

---

[2]See Cienega Gardens v. United States, 194 F.3d 1231, 1234-35 (Fed. Cir. 1998), cert. denied, 528 U.S. 820 (1999), for a basic overview of the relevant federal housing programs.

the incentives – specifically, Congress required owners to file a "plan of action" demonstrating to HUD that prepayment would not unduly burden low-income tenants. Essentially, ELIHPA imposed a moratorium on all prepayments.[3]

In 1990, Congress replaced ELIHPA with the Cranston-Gonzalez National Affordable Housing Act (NAHA), Pub. L. No. 101-625, 104 Stat. 4079 (1990) (codified at 42 U.S.C. §§ 12701-898 (2000)). One portion of NAHA, the Low-Income Housing Preservation and Resident Homeownership Act of 1990 (LIHPRHA), Pub. L. No. 101-625, tit. VI, 104 Stat. 4249 (codified at 12 U.S.C. §§ 4101 et seq. (2000)), was enacted for the purpose of preserving the nation's supply of low-income housing. Under LIHPRHA, an owner had to notify the federal and local governments and the tenants of its intent to prepay. HUD then had authority to offer a package of incentives to the owners in an attempt to keep their developments in the program. An owner who rejected these incentives still had to meet stringent conditions before receiving HUD's permission to prepay the federally subsidized mortgage and privatize the property.

LIHPRHA contains an express preemption provision that prohibits state laws that "restrict or inhibit" prepayment:

---

[3]Congress announced in § 202(b) that the purpose for ELIHPA was:

(1) to preserve and retain to the maximum extent practicable as housing affordable to low income families or persons those privately owned dwelling units that were produced for such purpose with federal assistance;
(2) to minimize the involuntary displacement of tenants currently residing in such housing; and
(3) to continue the partnership between all levels of government and the private sector in the production and operation of housing that is affordable to low income Americans.

No State or political subdivision of a State may establish, continue in effect, or enforce any law or regulation that –

(1) restricts or inhibits the prepayment of any mortgage described in section 4119(1) of this title (or the voluntary termination of any insurance contract pursuant to section 1715t of this title) on eligible low income housing;

. . . .

(3) is inconsistent with any provision of this subchapter, including any law, regulation, or other restriction that limits or impairs the ability of any owner of eligible low income housing to receive incentives authorized under this subchapter (including authorization to increase rental rates, transfer the housing, obtain secondary financing, or use the proceeds of any such incentives); or

(4) in its applicability to low-income housing is limited only to eligible low-income housing for which the owner has prepaid the mortgage or terminated the insurance contract.

Any law, regulation, or restriction described under paragraph (1), (2), (3), or (4) shall be ineffective and any eligible low-income housing exempt from the law, regulation, or restriction, only to the extent that it violates the provisions of this subsection.

12 U.S.C. § 4122(a). Forest Park's mortgage is described in 12 U.S.C. § 4119(1) and the insurance is eligible for termination under 12 U.S.C. § 1715t; however, Appellees argue that this provision is not applicable to Forest Park's Section 236 mortgage because of Congress's subsequent actions.

In the later 1990s, Congress realized that the LIHPRHA incentive programs were too costly. It began to cut back on funding for LIHPRHA,[4] and, beginning in

---

[4]Congress has not funded LIHPRHA at all since FY 1998; therefore, no new applications for the incentive programs are being accepted or reviewed by HUD.

1996, Congress adopted a series of new programs to deal with the low-income housing shortage and to protect tenants threatened with displacement from current federally subsidized properties. Congress passed the Housing Opportunity Program Extension Act of 1996 (HOPE), Pub. L. No. 104-120, 110 Stat. 834, which allowed for prepayment of the mortgages "notwithstanding the requirements of" the previous LIHPRHA provision prohibiting prepayment without a plan of action. Congress made this provision permanent in 1999 with Section 219 of the 1999 Appropriations Act, Pub. L. No. 105-276, § 219(b)(3), 112 Stat. 2461.[5]

After removing many of the restrictions on repayment, Congress recognized that the money HUD had been spending on Section 236 subsidies would now be

_____

[5]Sec. 219. (a) Prepayment Right.--Notwithstanding [prior acts]

(1) the owner of the project may prepay, and the mortgagee may accept prepayment of, the mortgage on the project, and

(2) the owner may request voluntary termination of a mortgage insurance contract with respect to such project and the contract may be terminated notwithstanding any requirements under sections 229 and 250 of the National Housing Act.

(b) Conditions.--Any prepayment of a mortgage or termination of an insurance contract authorized under subsection (a) may be made--

(1) only to the extent that such prepayment or termination is consistent with the terms and conditions of the mortgage on or mortgage insurance contract for the project;

(2) only if the owner of the project involved agrees not to increase the rent charges for any dwelling unit in the project during the 60-day period beginning upon such prepayment or termination; and

(3) only if the owner of the project provides notice of intent to prepay or terminate, in such form as the Secretary of Housing and Urban Development may prescribe, to each tenant of the housing, the Secretary, and the chief executive officer of the appropriate State or local government for the jurisdiction within which the housing is located, not less than 150 days, but not more than 270 days, before such prepayment or termination . . . .

available for other uses. In all of the appropriations acts since 1996, Congress has created new methods for rerouting those funds into other programs that help to retain low-income housing, including refinancing options and rehabilitation grants. Congress has also directed some of these recaptured funds into "enhanced" Section 8 vouchers. See 42 U.S.C. § 1437f (2000). The voucher program allows residents to remain in formerly subsidized housing even after rents go up when a mortgage is prepaid and rental rates are governed by free market forces. Although the vouchers often provide an immediate solution to these tenants' housing problems, many families are apparently unable to use them or to receive their full benefit.

## III. The Minnesota Statutes

The Minnesota statutes at issue in this case require that owners of federally subsidized low-income housing follow additional requirements and different time schedules for prepayment than those contained in the federal statute and regulations. One statute provides that:

> The landlord of federally subsidized rental housing must give residential tenants of federally subsidized rental housing a one-year written notice under the following conditions:
> (1) a federal section 8 contract will expire;
> (2) the landlord will exercise the option to terminate or not renew a federal section 8 contract and mortgage;
> (3) the landlord will prepay a mortgage and the prepayment will result in the termination of any federal use restrictions that apply to the housing; or
> (4) the landlord will terminate a housing subsidy program.

Minn. Stat. Ann. § 504B.255 (West 2002). The other statute requires that the owner submit a "tenant impact statement" to the tenants, the state housing finance agency, and the metropolitan council at least 12 months before termination of participation in a federally assisted rental housing program. The statement must include specific

information about the effect of termination. Minn. Stat. Ann. § 471.9997 (West 2001).

Essentially, the purpose of these state statutes is to give state agencies and nonprofit organizations enough time to propose alternatives to the owner and to offer the owner financial incentives for maintaining the low-income, federally subsidized housing, or for transferring it to someone who will preserve it as low-income housing. Additionally, the state statutory scheme provides the tenants enough time to make other housing arrangements, apply for Section 8 vouchers, or seek assistance in securing alternative housing. Indeed, the second statute was passed as part of a biannual appropriation of $20 million in state funds to be used to finance the creation, acquisition, rehabilitation, debt restructuring, or preservation of federally assisted rental properties that are otherwise eligible for withdrawal from the federal program.

## IV. Analysis

This appeal is from the district court's grant of summary judgment declaring that the state statutes are not preempted and its issuance of a permanent injunction requiring compliance with the state statutes as a precondition of prepayment. Appellees originally petitioned the district court for a preliminary injunction, but after the court ruled that only legal issues were involved and that those legal issues were resolved with the grant of summary judgment, the court issued a permanent injunction. Cf. Bank One v. Guttau, 190 F.3d 844, 847 (8th Cir. 1999) (reviewing a preliminary injunction as a permanent injunction where only legal issues were disputed), cert. denied, 529 U.S. 1087 (2000). The summary judgment decision is reviewed de novo. Eddings v. City of Hot Springs, 323 F.3d 596, 600 (8th Cir. 2003). The district court's issuance of a permanent injunction is reviewed for an abuse of discretion. Randolph v. Rodgers, 170 F.3d 850, 856 (8th Cir. 1999). "Abuse of discretion occurs if the district court reaches its conclusion by applying

-11-

erroneous legal principles or relying on clearly erroneous factual findings." Id. (citation omitted).

A court must consider the following factors in determining whether to issue a permanent injunction: (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties; (3) whether the movant proves actual success on the merits; and (4) the public interest. See Guttau, 190 F.3d at 847 (adapting the preliminary injunction factors announced in Dataphase Sys., Inc. v. C.L. Sys., Inc. 640 F.2d 109, 113 (8th Cir. 1981), to a review of a permanent injunction). Because an injunction would be legally unwarranted if the state statutes are preempted, cf. Guttau, 190 F.3d at 847-48 (noting that other factors are irrelevant if the statutes at issue are preempted), we turn first to the merits of the preemption claim.

Forest Park asserts that the Minnesota statutes are preempted by the federal laws establishing low-income housing programs. Forest Park argues that one section of LIHPRHA expressly preempts the state statutes, and, alternatively, that the state statutes are impliedly preempted because they conflict with federal law. In arguing the merits of these claims, the parties engage in a battle of legislative history. While this is the traditional way to litigate a preemption claim, see Gade v. Nat'l Solid Wastes Mgmt. Ass'n, 505 U.S. 88, 96 (1992) (noting that the "ultimate touchstone" of a preemption analysis is congressional intent), the unique federal laws and programs involved in this case make it difficult to apply a traditional preemption analysis. Furthermore, unlike cases involving a field traditionally regulated by the states, there is no presumption against preemption in this case. See Buckman Co. v. Plaintiffs' Legal Comm., 531 U.S. 341, 347 (2001) ("[T]he relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law.").

The facts of the case boil down to this: A private participant in a federal housing program who seeks to withdraw from participation pursuant to the provisions of that program permitting withdrawal is being prohibited by a state law from taking the action that the federal government has otherwise authorized. The effect is that the state law forces the federal government to continue to provide financial assistance to the participant when both the federal government and the participant have chosen to end their relationship. In this way, the state law not only regulates the conduct of the citizen-owner, requiring him to take additional actions in order to withdraw, but also regulates or restricts the actions of the federal government under its own federal program.

Appellees focus on the "front-end" of the state statutes, arguing that it is not impossible to comply with both the federal and state requirements because Forest Park could give 365 days notice to the state and 250 days notice to HUD. They also argue that the state statutes do not impede the goal of federal law because both the state and federal statutes have the same underlying purpose of providing low-income housing. While we recognize that these statements may be true, these arguments do not address the principal problem with these state statutes – they fly in the face of the Constitution's Supremacy Clause. Consider the case of a Minnesota developer who had already met the federal requirements and chose to go ahead with prepayment without complying with the state requirements. It is very doubtful that the state of Minnesota or a private tenants' association relying on the Minnesota statutes could prevent HUD from accepting prepayment pursuant to the federal statutes and releasing the owner from the requirements of the program. This situation presents the quintessential case of the Supremacy Clause in action. See U.S. Const. art. VI, cl. 2. Simply, state statutes may not interfere with the implementation of a federal program by a federal agency. Federal law is supreme. Under this analysis, legislative history is irrelevant. Minnesota law is preempted because it is inconsistent with the supremacy of the federal law made pursuant to the Constitution.

-13-

We also agree with Forest Park that the state statutes are expressly and impliedly preempted by the applicable federal statutes. Appellees do not dispute that, by its language, the express preemption provision contained in 12 U.S.C. § 4122 (LIHPRHA) applies to Forest Park's mortgage. However, Appellees contend that because Forest Park did not participate in the LIHPRHA incentive program ("work out plans"), and because that program is essentially "moribund" because it has received no funding since 1998, § 4122 does not preempt Minnesota law as it applies to Forest Park's mortgage. Appellees argue that § 4122 only preempts state statutes that "restrict or inhibit" the prepayment of mortgages subject to LIHPRHA's work out plans or those receiving LIHPRHA assistance.

After reviewing the language of the statute and its legislative history, we do not find Appellees' argument persuasive.[6] Congress used very broad language in defining the types of mortgages covered by the preemption provision. To the extent that it intended preemption to apply only to laws affecting mortgages subject to LIHPRHA, it could have stated as much. The fact that Congress no longer funds the incentive programs established by LIHPRHA does not mean that the prepayment provisions contained therein are irrelevant or that the statute is no longer the law.

Applying § 4122, we next turn to whether the Minnesota statutes "restrict or inhibit" the prepayment of mortgages. To the extent that owners comply with the

---

[6]Citing <u>Kenneth Arms Tenant Assoc. v. Martinez</u>, Civ. No. S-01-832, 2001 U.S. Dist. LEXIS 11470 (E.D. Cal. July 3, 2001), the district court concluded that HUD has adopted Appellees' position. <u>See</u> 203 F. Supp. 2d at 1075-76. However, this conclusion was based solely on a letter written by a HUD attorney in the <u>Kenneth Arms</u> litigation purporting to interpret the applicability of the preemption provision. Although courts often extend deference to an agency's interpretation of an ambiguous statute, <u>see</u> <u>Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.</u>, 467 U.S. 837, 844-45 (1984), we owe no deference to an opinion letter purporting to interpret a statute that is not the result of the agency's rulemaking procedures. <u>See</u> <u>Christensen v. Harris County</u>, 529 U.S. 576, 587 (2000).

-14-

notice and reporting requirements, nothing in the state statutes may be read to give the state authority to preclude an owner's attempt to prepay. The requirements in the state statutes were created to give the state additional time to offer incentives or other options to owners seeking to prepay, not to serve as an "application" for permission to prepay. The statutes do not, on their face, directly "restrict or inhibit" the prepayment of mortgages; however, to the extent that compliance with additional state regulations is required, the statutes have the direct effect of impeding, burdening, and inhibiting the prepayment of federal mortgages even if the additional requirements may be minimal. Because the statutes, as enforced through an injunction in this case, allow the state to prohibit prepayment when an owner has otherwise complied with the federal notice requirements, the practical effect of these statutes is to "restrict or inhibit" prepayment, and the state laws fall well within the range of those the federal statute expressly preempts.

We also believe that the federal statutes and regulatory scheme impliedly preempt the state statutes because the state statutes conflict with the federal law. This court may find implied conflict preemption "where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Nordgren v. Burlington N. R.R. Co., 101 F.3d 1246, 1248 (8th Cir. 1996) (quoting Freightliner Corp. v. Myrick, 514 U.S. 280, 287 (1995) (internal citations omitted)). In determining whether state law "stands as an obstacle" to the full implementation of a federal law, "it is not enough to say that the ultimate goal of both federal and state law" is the same. Int'l Paper Co. v. Ouellette, 479 U.S. 481, 494 (1987). "A state law also is pre-empted if it interferes with the methods by which the federal statute was designed to reach th[at] goal." Id. Thus, "[w]here a state statute conflicts with, or frustrates, federal law, the former must give way." CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 663 (1993).

Forest Park argues that the state statutes interfere with the federal method of implementing the housing programs. It agrees that the purpose and objective of

-15-

Congress in creating housing subsidy programs was to provide low-income housing, but that within that goal was the desire to involve private developers in the process. Congress's objective in allowing for prepayment of the federally subsidized mortgages was to further the goal of encouraging private participation in the federal programs. Although Congress has taken various steps since 1968 to restrict a participant's right to prepay, the current state of the law is that a participant need only give between 150 and 270 days notice, without further permission by HUD, to prepay and withdraw from the program. A further requirement imposed by a state statute would directly interfere with Congress's original intent of offering prepayment as an incentive. Any state statute that forces owners to remain in a federally subsidized program from which Congress has authorized withdrawal would eviscerate the method Congress chose to implement the federal low-income housing scheme. Even though the state requirements – providing additional notice and a "tenant impact statement" – do not appear to preclude a participant's right to prepay, in cases where owners do not comply with state law or where compliance is somehow inadequate, the state, by enforcing its own statutes, is the sole entity standing in the way of an owner's exercise of its federally granted right to prepay and withdraw from the program. Despite the fact that the federal statute and the state statute may share the same objective, the state procedures interfere with the framework created by Congress.

We do not suggest that all state attempts at preserving existing federally subsidized, low-income housing are preempted. Nothing in the federal statutes, their legislative history, or their stated objectives indicates that states are prohibited from instituting their own incentive plans or other programs to preserve low-income housing within the framework of the federal prepayment scheme. When, however, these state programs place additional requirements on federal program participants, restrict the exercise of the participants' federally granted prepayment rights, or create delays in the prepayment process, they are preempted.

We reject Forest Park's argument that the district court erred because it did not require Appellees to post a bond when it issued the permanent injunction. Federal Rule of Civil Procedure 65(c) provides that "[n]o restraining order or preliminary injunction shall issue except upon the giving of security by the applicant." Rule 65(c) applies only to temporary restraining orders or preliminary injunctions. Here, the court entered a permanent injunction; therefore Rule 65(c) does not apply. See Ty, Inc. v. Publ'ns Int'l Ltd., 292 F.3d 512, 516 (7th Cir. 2002) (holding that an injunction bond is required only for a temporary restraining order or a preliminary injunction, not for a permanent injunction), cert. denied, 123 S. Ct. 892 (2003).

Because we hold that the Minnesota statutes are preempted and that Appellees cannot prevail on the merits of their claim, we need not address the parties' remaining arguments. Accordingly, we reverse the district court's judgment, we vacate the permanent injunction, and we remand with directions for the district court to enter judgment in favor of Appellant Forest Park.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.